## In re STURGIS IRON & METAL CO., INC., Debtor.

No. HK 08–02966.

United States Bankruptcy Court, W.D. Michigan.

Sept. 30, 2009.

---

Richard E. Kruger, Esq., Detroit, MI, attorney for the Debtor.

Robert H. Skilton, Esq., Grand Rapids, MI, attorney for Fifth Third Leasing Co.

Aaron M. Silver, Esq., Detroit, MI, attorney for the Official Committee of Unsecured.

Creditors Dean E. Rietberg, Esq., Grand Rapids, MI, attorney for the United States Trustee.

## OPINION RE: FIFTH THIRD LEASING'S AUGUST 22, 2008 MOTION

JEFFREY R. HUGHES, Bankruptcy Judge.

The SEET Connecticut Statutory Trust ("SEET Connecticut") has a commercial equipment lease with Sturgis Iron & Metal Co. ("Debtor"). Fifth Third Leasing Company ("Fifth Third") is the trust's servicing agent. Fifth Third requests, over the Committee's objection, the allowance of an administrative claim for rents and taxes owed on account of that lease.

### BACKGROUND

Debtor recycled metal from scrapped vehicles. The equipment it used to process the vehicles included the shredder it leased from SEET Connecticut. That shredder, which is large enough to accommodate a school bus, is still located at Debtor's Indiana facility.

Debtor filed for Chapter 11 relief on April 4, 2008. Debtor intended from the outset to liquidate its operations and, in fact, it rejected the lease with Connecticut SEET by June of that same year. Nonetheless, two payments for rent had accrued prior to the lease's rejection and, as a consequence, Fifth Third demands that it be allowed as administrative rent the $404,120.16 that had accrued. The Committee opposes the request, arguing in-

stead that Fifth Third is entitled to at most a nominal amount because the estate used the shredder little, if at all, postpetition.

Fifth Third also asks that it be allowed an administrative expense for 2008 property taxes associated with the shredder. Fifth Third calculates that the Debtor's pro rata share is $40,312.56. However, the Committee argues that the estate owes Fifth Third nothing because the lease had been rejected well before Debtor had any obligation to account for the taxes due.

## DISCUSSION

### A. Is Fifth Third Entitled To Receive As Administrative Rent Under Section 503(b)(1)(A)[1] The Two Postpetition Monthly Payments That Came Due Under The Lease Before Debtor Rejected It?

#### 1. Logic and the Plain Meaning of Section 503(b)(1)(A)

It would appear at first glance that the Committee comes to this battle aboard a dreadnought while Fifth Third approaches on an open raft.[2] After all, the position the Committee advocates—that a lessor's claim for administrative rent is to be limited to only that which reflects the estate's actual use of the property demised—is supported by no less than 34 cases gathered from what the Committee accurately describes as "myriad" others. In contrast, Fifth Third has managed to muster only a single decision: *In re Palace Quality Services, Inc.*[3]

However, Fifth Third does enjoy the singular advantage of the undersigned being both the author of *Palace Quality* and this opinion.[4] Fifth Third also has the benefit of logic and the English language, for both call into question the position the Committee advocates. Perhaps the law tolerates inconsistencies better than either science or mathematics. Nonetheless, the law, and in particular, codes, require at the very least that there be harmony between the rule espoused and the underlying concepts from which that rule is derived.

The Committee's problem is simply that the "well established" rule it cites falls short of this standard. To begin, executory contracts and unexpired leases are not, as the Committee would have it, interchangeable. An executory contract, to use Professor Countryman's definition, is:

[a] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.

*Terrell v. Albaugh*, 892 F.2d 469, 471, n. 2 (6th Cir.1989) (quoting from Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L.Rev. 439, 460 (1973)).[5]

For example, A's agreement to sell Blackacre to B in exchange for $10,000 is an executory contract because A's obligation to deliver the deed to Blackacre as promised would be excused if B reneged on his promise to pay just as B's obligation

---

**1.** 11 U.S.C § 503(b)(1)(A). Unless otherwise designated, all further references to "Section ____," "Bankruptcy Code," or "Code" shall be to the Bankruptcy Code as currently amended. 11 U.S.C. §§ 101, *et seq.*

**2.** H.L. Mencken.

**3.** 283 B.R. 868 (Bankr.E.D.Mich.2002).

**4.** The undersigned wrote *Palace Quality* while assigned as a visiting judge to the Eastern District of Michigan.

**5.** *See also, N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 522, n. 6, 104 S.Ct. 1188, 1194, 79 L.Ed.2d 482(1984) (holding that an executory contract is one on which performance is due to some extent on both sides).

to pay $10,000 would be excused if A reneged on his promise to deliver Blackacre.

■ A textbook lease does not fit this definition.[6] A lease may still be unperformed from the tenant's perspective because of his promise to pay periodic rent over the lease's term.[7] However, there typically is no corresponding unperformed promise on the part of the landlord because his commitment to turnover possession of the subject property would have been fulfilled at the outset of the lease.[8] Indeed, a landlord's relationship with his tenant is more akin to an estoppel. The law, in other words, estops a landlord from retaking possession of what otherwise rightfully belongs to him only because the landlord agreed to relinquish possession of his property in the first place. The law equally recognizes, though, that this relinquishment of possession is itself a function of conditions the landlord also imposed, such as the tenant's timely payment of a specified rent. As a consequence, the landlord can be kept at bay only so long as these conditions are being met. This is the reason why legal scholars describe a lease as property *cum onere*—i.e., property with a burden. *Palmer v. Palmer*, 104 F.2d 161, 163 (2nd Cir.1939) and BLACK'S LAW DICTIONARY (6th ed.1990).[9]

■ However, as burdened as the tenant's right to possess the landlord's property may be, it is nonetheless clear from

6. Lease. Any agreement which gives rise to relationship of landlord and tenant (real property) or lessor and lessee (real or personal property). A contract for exclusive possession of lands, tenements or hereditaments for life, for term of years, at will, or for any interest less than that of lessor, usually for a specified rent or compensation. Contract wherein one lets to the other a certain space, property or building for specified unit of time, generally a week, month or year. Agreement under which owner gives up possession and use of his property for valuable consideration and for definite term and at end of term owner has absolute right to retake, control and use property.
BLACK'S LAW DICTIONARY 889 (6th ed.1991) (citations omitted).

7. Of course, if the tenant paid all of the agreed upon rent at the outset of the term, then even this executory element of the unexpired lease would be absent.

8. Leases can, of course, include a lessor's executory promises as well. For example, a landlord may promise to insure the premises, pay applicable taxes, or plow the parking lot. Indeed, the Bankruptcy Code itself addresses the circumstances under which the estate, as the debtor's successor to the leasehold interest, may compel the lessor to perform these ancillary promises. 11 U.S.C. § 365(b)(4). However, a lease may also be devoid of such promises, as is exemplified by what is often referred to as a triple-net lease—i.e., a lease where insurance, taxes and maintenance are all the tenant's responsibility. In fact, the lease agreement in this instance describes itself as a "net lease" with "all costs, expenses and liability associated with the Equipment or its lease [to] be borne by Lessee." ¶ 4, Master Equipment Lease Agreement, attached as Ex. A to Fifth Third/SEET Connecticut's August 22, 2008 Motion.

9. A key characteristic of this [a landlord/tenant] relationship is that the lessee's rights in the property **derive** from those of the lessor. The lessor always retains ownership of the property which is subject to the lease, whether the property is real estate, an automobile, or something else. Whatever right the lessee has to use that property is dictated by the terms of the agreement reached with the lessor. A lessee may continue to use the subject property to the exclusion of the lessor only for so long as the lessee pays the agreed rent and otherwise complies with the terms of the lease. If the lessee defaults, then the lessor has the right to regain possession of the subject property. The lessor can regain possession either through the lessee's voluntary abandonment of the leasehold interest or through legal process. Either way, the recovery of possession results in the resurrection of the lessor's undivided interest in the subject property which had existed prior to its grant of the leasehold interest to the lessee.
*Palace Quality*, 283 B.R. at 879–80 (emphasis in original).

the Bankruptcy Code's legislative history that this right, or better, leasehold, is still a property interest under Section 541.

> This section [Section 541] defines property of the estate, and specifies what property becomes property of the estate. The commencement of a bankruptcy case creates an estate. Under paragraph (1) of subsection (a), the estate is comprised of all legal or equitable interest of the debtor in property, whenever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action (see Bankruptcy Act § 70a(6)), and all other forms of property currently specified in section 70a of the Bankruptcy Act § 70a, as well as property recovered by the trustee under section 542 of proposed title 11, if the property recovered was merely out of the possession of the debtor, yet remained "property of the debtor." **The debtor's interest in property also includes "title" to property, which is an interest, just as are a possessory interest, or leasehold interest, for example.**

H.R.Rep. No. 95–595, at 367 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6323; S.Rep. No. 95–989, at 82 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5868 (emphasis added).[10]

As such, a leasehold, like all other interests of the debtor, immediately becomes property of the estate whenever bankruptcy relief is sought.[11]

**10.** *See also, Triad International Maintenance Corp. v. Southern Air Transport, Inc. (In re Southern Air Transport, Inc.),* 511 F.3d 526, 533–34 (6th Cir.2007) ("It follows that SAT's right under the lease to exclusively possess the aircraft constituted property of the estate under 11 U.S.C. § 541(a)(1)."); *48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.),* 835 F.2d 427, 430 (2nd Cir.1987)("The courts are in agreement that unexpired leasehold interests ... constitute property of the bankrupt estate."); *Arizona Appetito's Stores, Inc. v. Paradise Village Inv. Co. (In re Arizona Appetito's Stores, Inc.),* 893 F.2d 216, 218 (9th Cir.1990) ("A leasehold is property of the estate if a debtor is the lessee of the property at the time the petition for bankruptcy is filed."); *Cinicola v. Scharffenberger,* 248 F.3d 110, 121 (3rd Cir. 2001); *L.R.S.C. Co. v. Ricket Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.),* 209 F.3d 291, 300 (3rd Cir.2000); *Brattleboro Hous. Auth. v. Stoltz (In re Stoltz),* 197 F.3d 625, 629 (2nd Cir.1999); *In re Am. Int'l Airways, Inc.,* 44 B.R. 143, 145 (Bankr.E.D.Pa.1984); *In re KDT Indus., Inc.,* 32 B.R. 852, 856 (Bankr. S.D.N.Y.1983); *In re Babco, Inc.,* 28 B.R. 656, 657–58 (W.D.Pa.1983); *In re Allan Steaks Corp.,* 22 B.R. 881, 882 (Bankr.D.Mass.1982); *In re Andorra Meat Mkt., Inc.,* 7 B.R. 744, 745–46 (Bankr.E.D.Pa.1980); *In re Nw. Recreational Activities,* 4 B.R. 36, 43 (Bankr. N.D.Ga.1980). *See also,* "Comparative Analysis" and "The Bankruptcy Code," *infra.*

**11.** 11 U.S.C. § 541(a)(1) ("The commencement of a case ... creates an estate" and "[s]uch estate is comprised of ... all legal and equitable interests of the debtor as of the commencement of the case."). *See, though, In re Attorneys Office Management, Inc.,* 29 B.R. 96 (Bankr.C.D.Cal.1983). In that case, the court declared that the estate did not take "title" to a lease unless and until it was assumed notwithstanding that court's recognition that the bankruptcy estate had already acquired some type of interest in the leased property at the case's inception. *Id.* at 98–99. Unfortunately, the court did not offer either case authority or, even more important, a rationale to support this conclusion. Moreover, *AOM's* reference to the estate acquiring something beyond what it already had acquired at the outset of the case is confusing, especially when the court also in its opinion referred to the landlord's own "reserved title" in the subject property. In other words, if, as the court in *AOM* recognizes, the estate acquired some interest in the leased property at the outset of the case, and if, as that court also acknowledges, the lessor itself continues to hold the "reserved title," one must ask what exactly is the "title" that supposedly is to be added to the estate's property rights should the estate also decide to assume the lease at some later date.

But the burdened nature of the leasehold acquired also calls into play a fundamental precept of bankruptcy law—that the estate can gain no greater right under the leasehold than had the debtor previously enjoyed unless the Bankruptcy Code itself creates that greater right. As the Supreme Court itself observed:

Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

*Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).[12]

And the Sixth Circuit has likewise stated:

Under 11 U.S.C. § 541, the trustee succeeds only to the title and rights in property that the debtor had and takes the property subject to the same restrictions that existed at the time the debtor

filed the petition. Thus, a debtor's rights may not be expanded beyond what they were at the commencement of the case.

*Demczyk v. Mutual Life Ins. Co. of New York (In re Graham Square, Inc.)*, 126 F.3d 823, 831 (6th Cir.1997) (citations omitted). *See also, In re Cook*, 457 F.3d 561, 566 (6th Cir.2006) and *Spradlin v. Jarvis (In re Tri–City Turf Club, Inc.)*, 323 F.3d 439, 443–44 (6th Cir.2003).[13]

How, then, does this rule apply when the interest acquired at the outset of the case is a burdened asset like an executory contract or an unexpired lease? The Committee contends that bankruptcy in fact overrides the normal relationship between the parties through its suspension of the nondebtor's right to demand further performance under the executory contract or lease until the estate makes its own decision under Section 365 to assume or reject the same. The Committee, though, can point to no provision within Section 365 itself that includes such a prohibition.[14]

---

**12.** In a much earlier opinion the Supreme Court expressed the same sentiment, albeit in a quainter fashion. "Under the present bankruptcy act, the trustee takes the property of the bankrupt ... in the same plight and condition that the bankrupt himself held it...." *Thompson v. Fairbanks*, 196 U.S. 516, 526, 25 S.Ct. 306, 310, 49 L.Ed. 577 (1905).

**13.** The legislative history also echoes this concept.

Though this paragraph [Section 541(a)] will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case. For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be barred. He could take no greater rights than the debtor himself had.

H.R.Rep. No.95–595, at 367–68 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6323; S.Rep. No.95–989, at 82 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5868.

**14.** Nor is there any reason why Section 365 should include such a provision, since specific performance is seldom available as a remedy, and when it is (e.g., when real estate is involved), the stay imposed by Section 362(a)(3) provides the needed protection. Consider, for instance, what happens when the debtor files his case after agreeing to sell property but before actually closing the sale. Although nonbankruptcy law would typically permit the purchaser to compel performance in lieu of receiving damages had the debtor not filed for bankruptcy relief, the automatic stay would keep the purchaser at bay until the trustee had had sufficient time to decide whether to reject the contract. If the trustee were men to reject it, that rejection would excuse the estate from what otherwise had been its obligation under state law to specifically deliver the deed as had been promised. Conversely, if the trustee were at that time to assume the contract, then the trustee could continue to demand the promised payment from the contract's buyer provided the requirements of Section 365(b) had otherwise been met. Or, to express these concepts as the Committee has fashioned them, the estate, as the debt-

Indeed, what Section 365 actually offers to the trustee is the ability to suspend the estate's own performance under a lease or contract yet still avoid the consequences of any resulting default should it later elect to assume the same. Take, for example, a debtor who supplies parts to a third party pursuant to a requirements contract. If that debtor were to file for Chapter 11 relief, it could decide as debtor-in-possession to temporarily halt postpetition deliveries in order to assess whether it was in the estate's interest to continue with that contract or not. If, after reflection, the debtor decided to assume the contract, then it could in effect regain its right to resume deliveries and to receive payment for the same so long as the debtor was able to cure the estate's previous default and otherwise comply with the requirements of Section 365(b). Or the debtor, as debtor-in-possession,

could ultimately decide to reject the executory contract with the equal assurance that whatever damages should arise from its decision to reject will be treated nonetheless as a prepetition indebtedness. 11 U.S.C. § 502(g)(1).

That Section 365 provides this opportunity to the estate does not mean, however, that the other party to the contract or lease must stand idly by in the interim. To the contrary, *Butner's* and *Graham Square's* neutral transfer rule [15] compels the conclusion that the other party may continue with its own rights and remedies unless some other Code section restricts the same. For instance, this court determined in *In re Lucre*[16] that the nondebtor party to an executory contract may legitimately refuse postpetition performance under that contract notwithstanding Section 365 if the estate, as the debtor's successor-in-interest, is itself in material breach of the same contract.[17]

or/seller's assignee, would have the right to enforce the contract against the buyer while the buyer would not have the reciprocal right to enforce the same contract against the estate. *But, compare*, Section 365(i), where, by operation of the Bankruptcy Code itself, a land contract vendee who is in possession can still compel from the estate performance of the underlying land contract.

15. The effect of the Section 541(a)(1) transfer is neutral. The newly created estate receives no more or no less under Section 541(a)(1) than what the debtor had to transfer. *Palace Quality*, 283 B.R. at 880 (emphasis in original).

16. 339 B.R. 648 (Bankr.W.D.Mich.2006).

17. The Committee contends that *Lucre* is inconsistent given that *Lucre* itself acknowledges that a trustee may enforce an executory contract prior to its assumption or rejection whereas the nondebtor party may not. *See*, Committee Brief, pp. 14–15, quoting from *Lucre*, 339 B.R. at 660, n. 12. However, there is no inconsistency, for all things being equal, a debtor-in-possession can demand the other contracting party's performance whereas the debtor-in-possession, because of Section 365(b), can always refuse performance with

the assurance that it can later cure that default and regain what otherwise would have been lost had only the law of contract applied. All that *Lucre* adds is simply this—that while the debtor-in-possession may be able to continue insisting upon the other contracting party's performance, the neutral transfer rule still leaves the other party with the option to refuse if the estate, as the debtor's successor, is itself in material default under that contract. Or, to put it differently, under applicable non-bankruptcy law, an estate in default can have no greater right to demand performance from the other contracting party than had the debtor unless and until the estate takes advantage of the cure provisions that are provided in conjunction with the contract's assumption under Section 365.

Nor is this concept any different in connection with unexpired leases. What has changed is only that the landlord's performance is no longer executory because possession of the promised property has, by definition, already been relinquished. Granted, the landlord is no more able to force the estate to pay rent than is the nondebtor party to an executory contract able to compel the estate to perform what was promised of it. But the landlord is no less within its rights under the lease to seek possession once again of the

A lessor, of course, could not respond in the same fashion since the lessor would have already performed his obligation (*i.e.*, the delivery of the leased property) at the outset of the relationship. However, if his tenant does not pay the rent as agreed, the lessor would most certainly have the right to recover what, after all, is his property. Moreover, it follows under *Butner* and *Graham Square* that the lessor would also have that same right to recover against any succeeding bankruptcy estate should it not pay the rent.[18] Or, as Judge Learned Hand said years ago in *Palmer*:

> [I]t would be a little hard to see by what power the court could keep a trustee in possession while he was determining his course, without compelling him meanwhile to fulfill the conditions imposed upon the term; for instance, the payment of any rent, secured by a right of reentry. While such ad interim payments need not, and of course would not, constitute an adoption of the term, insolvency ought not to give the lessee's creditors greater rights to possession than the lessee himself enjoyed; **and if the trustee were to hold the premises even temporarily, he should be allowed to do so only upon the same terms as the lessee.**

104 F.2d at 163 (emphasis added).[19]

But, if Judge Hand's logic is sound, then what justifies the Committee's insistence that a lessor must forgo what is otherwise its due and accept instead as its administrative rent under Section 503(b)(1)(A) only that which is deemed fair under the circumstances? After all, Section 503(b)(1)(A) itself states that "there **shall** be allowed" as administrative expenses "the actual, necessary costs and expenses of **preserving the estate**" (emphasis added). The edges of what is meant by this language may be gray.[20] However, given

demised premises if the estate fails to pay rent than is the nondebtor party to an executory contract within its rights to refuse performance if the estate, either as a successor or in its own right, is in breach of that contract.

**18.** The lessor would, of course, still have to secure relief from the automatic stay before enforcing the remedy. But the stay is only a constraint. It does not, as the Committee seems to suggest, alter what otherwise are the lessor's legitimate rights under the lease that carryover to the estate as the debtor's successor in interest. *See*, "The Automatic Stay and Section 365(d)(5)," *infra* and "Section 503(b)(1)(A) and the *Piggly–Wiggly* Alternative," *infra*.

**19.** Although not as eloquently stated, *Palace Quality* makes the same point:
> A leasehold interest which is acquired by the bankruptcy estate from the debtor is no less subject to this "neutral transfer" principle than any other property interest held by the debtor. If the debtor is obligated to pay an agreed rental fee as a condition to possessing property which is owned by the lessor, then the bankruptcy estate must also be subject to that same obligation as a condition to the estate's continued possession of that property. Otherwise, the bankruptcy estate would have rights in the leased property greater than those which the debtor had to transfer pursuant to Section 541(a)(1): Put simply, Section 541(a)(1) offers the trustee no independent right to remain in possession of leased property acquired from the debtor. Whatever right the trustee has under Section 541(a)(1) must derive from the debtor. Therefore, the estate must be bound by the same lease terms as those which bound the debtor pre-petition.

283 B.R. 880–81. *See also*, *In re Frazin*, 183 F. 28, 31–32 (2nd Cir.1910) ("Moreover, if the bankrupt be divested of his interest in the leasehold estate, and it be vested in the trustee immediately upon his appointment, it is difficult to see upon what theory he can escape its obligations pending its retransfer.").

**20.** Although modern courts, including the Sixth Circuit, have embellished the "actual, necessary" language of Section 503(b)(1)(A) to require that there be a direct and substantial benefit to the estate as well (*see, e.g., Caradon Doors and Windows, Inc. v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.)*, 447 F.3d 461, 464 (6th Cir.2006)), the "benefit" requirement has nonetheless been relaxed to permit *Reading Co. v. Brown's* ex-

that the bankruptcy estate now includes leasehold interests from the outset of the case, it is difficult to imagine a more actual or necessary expense of preserving that estate than the payment of the very rent that nonbankruptcy law clearly recognizes as an absolute condition to the estate's continued possession of the property leased.[21] Or, put differently, an estate cannot maintain property *cum onere*—i.e., property with a burden—without the estate also enduring the burden imposed.

Indeed, given the Supreme Court's and the Sixth Circuit's repeated pronouncements that courts must respect a statute's plain meaning, it is fair to ask why any more consideration of the case law is even needed.

> We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'

*Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (citations omitted).[22] However, this court would be remiss if it were to just ignore the multitude of contrary decisions the Committee has been able to amass. Therefore, it is appropriate to determine why all of these other courts have come to such a different conclusion.

## 2. Case Law

### (a) Cited Decisions

The Committee extracts as leading authority for its position the following from *In re Braniff Airways:*

> If the trustee assumes the lease, the debtor's estate becomes liable for the full rent accruing under the terms of the lease. If the trustee ultimately rejects the lease, the debtor's estate is liable only for the reasonable value of its use and occupancy of the premises.... [I]f there is no benefit to the estate, the breach of an executory agreement or lease does not give rise to a claim for administrative expense, but only an unsecured breach of contract claim under section 502(g).

Committee Brief, p. 6 (quoting from 783 F.2d 1283, 1285–86 (5th Cir.1986)).

However, what is lacking in *Braniff Airways* and, for that matter, the rest of the cases the Committee has gathered, is independent analysis. Granted, each case cited offers its own accumulation of authoritative decisions. But as Lord Rutherford, the Nobel laureate and unabashed physi-

---

ception for postpetition negligence claims incidental to the estate's continued operation of the debtor's business. *See, e.g., Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.),* 126 F.3d 811, 817 (6th Cir.1997) ("To be sure, the *Reading* rationale allows administrative expense priority in the absence of a post-petition benefit to the estate.").

**21.** *See also, Palace Quality:*

> Given that the payment of the agreed upon rent is the essence of the lessee's right to enjoy exclusive possession of property under a leasehold, the ineluctable conclusion is that post-petition rents under a leasehold interest which has become property of the estate are expenses necessarily incurred by the estate to preserve that leasehold interest pending the trustee's decision to ultimately assume or reject the lease.

283 B.R. at 898.

**22.** *See also, White v. Kentuckiana Livestock Market, Inc.,* 397 F.3d 420, 426 (6th Cir.2005) ("Generally speaking, of course, '[t]he plain meaning of legislation should be conclusive, except in the rare instances in which the literal application of a statute will produce a result demonstratively at odds with the intentions of its drafters.' ") (quoting from *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)).

cist, liked to point out, stamp collecting is not physics.

Moreover, with little exception, all of the cases relied upon can be traced back to decisions made under the former Bankruptcy Act. For instance, the Committee cites as a companion case *Thompson v. IFG Leasing Co.*:

> When a lease is ultimately rejected but its interim continuance was an actual and necessary cost and expense to the estate, the allowable administrative expense is valued not according to the terms of the lease but under an objective worth standard that measures the fair and reasonable value of the lease.

788 F.2d 560, 563 (9th Cir.1986) (citations omitted).

But eight of the nine decisions relied upon in *Thompson* were Bankruptcy Act cases [23] and the ninth one, while certainly a Code case,[24] references yet three more pre-Code opinions.[25]

This criticism is equally applicable to the Supreme Court and Sixth Circuit cases cited by the Committee. The Court certainly said in *N.L.R.B. v. Bildisco and Bildisco* that "[i]f the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984). However, with all due respect, the Court provides no more insight than *Braniff* or *Thompson;* rather, it supports its statement simply by citing yet another vintage Act case, that being *Philadelphia Co. v. Dipple,* 312 U.S. 168, 312 U.S. 656, 61 S.Ct. 538, 85 L.Ed. 651 (1941). Moreover, *Bildisco* involved a collective bargaining agreement, which is an executory contract, not an unexpired lease.[26] Consequently, *Bildisco* never had to address the question Judge Hand's comment in *Palmer* prompts. That is, how can a bankruptcy estate whose rights in a leasehold derive solely from those of the debtor continue in possession of the demised premises for even a moment without also having to pay the rent upon which the leasehold is conditioned?

As for the Sixth Circuit, the Committee has cited the leading cases of *Employee Transfer Corp. v. Grigsby (In re White Motor Corp.),* 831 F.2d 106 (6th Cir.1987) and *United Trucking Service, Inc. v. Trailer Rental Company, Inc. (In re United Trucking Service, Inc.),* 851 F.2d 159 (6th Cir.1988). But *White Motor* relies primarily upon the former Act case of *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950 (1st Cir.1976) and *United Trucking* relies upon

---

**23.** *Hall v. Perry (In re Cochise College Park, Inc.),* 703 F.2d 1339 (9th Cir.1983) (Act case); *Nw. Mut. Life Ins. Co. v. Axton (In re Axton),* 641 F.2d 1262 (9th Cir.1981) (Act case); *S & W Holding Co. v. Kuriansky,* 317 F.2d 666 (2nd Cir.1963); *120 Wall Assocs. v. Schilling,* 266 F.2d 548 (2nd Cir.1959); *Mathews v. Butte Mach. Co.,* 286 F. 801 (9th Cir.1923); *Dayton Hydraulic Co. v. Felsenthall,* 116 F. 961 (6th Cir.1902); *Brown v. Danning (In re Fredrick Meats, Inc.),* 483 F.2d 951 (9th Cir. 1973); *Don Allen Chevrolet, Inc. v. Foreman (In re First Research Corp.),* 457 F.2d 331 (5th Cir.1972).

**24.** *Union Leasing Co. v. Peninsula Gunite, Inc. (In re Peninsula Gunite, Inc.),* 24 B.R. 593 (9th Cir.BAP1982).

**25.** *In re Fredrick Meats,* 483 F.2d 951 (9th Cir.1973); *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.,* 280 F.2d 119 (2nd Cir.1960); and *Don Allen Chevrolet, Inc. v. Foreman (In re First Research Corp.),* 457 F.2d 331 (5th Cir.1972).

**26.** 465 U.S. at 521–22, 104 S.Ct. 1188.

the even older case of *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119 (2nd Cir. 1960).[27]

Moreover, neither *White Motor* nor *United Trucking* is on point since neither addresses the question of administrative rent on account of an unexpired lease. Like *Bildisco, White Motor* involved an executory contract, not an unexpired lease.[28] Indeed, *United Trucking* itself distinguished *White Motor* for exactly that reason.

> In contrast [to *White Motor*], this case involves a claim arising from United's post-petition continued use of leased equipment that was allegedly not in accordance with the terms of the pre-petition lease agreement. We therefore do not believe the key inquiry is on inducement as in *Mammoth Mart, Jartran,* and *White Motor.*

*United Trucking, Id.* at 162.

And while *United Trucking* did address claims arising from leases, the issues in that case were whether the lessor was entitled to an administrative claim for (1) damages done by the debtor-in-possession to the trailers postpetition, and (2) the loss of another trailer that had been stolen prepetition. Nothing was said in *United Trucking* about administrative rent.[29]

In summary, then, the overwhelming authority that the Committee has brought to bear against Fifth Third's claim for administrative rent rests for the most part upon case law decided prior to the Bankruptcy Code's enactment. Therefore, these earlier decisions need to be examined more closely.

### (b) Pre–Code Authority

As ably explained by Professor Michael T. Andrew in *Executory Contracts in Bankruptcy: Understanding "Rejection,"*[30] much of what became the law

---

**27.** *White Motor,* 831 F.2d at 110 and *United Trucking,* 851 F.2d at 162.

**28.** The debtor in *White Motor* had contracted prepetition with Employee Transfer Corporation ("ETC") to provide relocation services for its transferred employees. ETC, at the employee's request, purchased the employee's home at an agreed upon price and then maintained the home until it could be re-sold. The debtor in turn would pay ETC for its services when finally billed, together with reimbursement for whatever direct costs ETC may have incurred. *Id.* at 107.

**29.** The Committee also cites as Sixth Circuit authority *Pension Benefit Guar. Corp. v. Sunarhauserman (In re Sunarhauserman, Inc.),* 126 F.3d 811 (6th Cir.1997); *Caradon Doors and Windows, Inc. v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.),* 447 F.3d 461 (6th Cir.2006); *City of White Plains, New York v. A & S Galleria Real Estate, Inc. (In re Federated Dept. Stores, Inc.),* 270 F.3d 994 (6th Cir.2001); and *Koenig Sporting Goods, Inc. v. Morse Road Co. (In re Koenig Sporting Goods, Inc.),* 203 F.3d 986 (6th Cir.2000). However, while *Sunarhauserman, Eagle–Picher* and *Federated* all addressed some aspect of Section 503(b)(1)(A) administrative priority,

none of these cases involved either the allowance of administrative rent or the proration under a lease of yet to be billed taxes, which are the two issues at hand. As for *Koenig Sporting Goods,* it if anything favors this court's approach of awarding administrative rent based upon when that rent becomes due under the lease. But in any event, *Koenig Sporting Goods* was decided under Section 365(d)(3) as opposed to Section 503(b)(1)(A) and, therefore, is distinguishable. *Id.* at 989. *See, infra.*

**30.** 59 U. Colo. L.Rev. 845 (1988). Professor Andrew's article attempts to eliminate much of the confusion that surrounds the treatment of executory contracts and unexpired leases under the Bankruptcy Code. Key to his effort is his contention that the current law cannot be understood unless it is given historical perspective. Consequently, this court is grateful to Professor Andrew for his extensive research and thoughtful insights concerning that history. Unfortunately, this court does not agree with many of his conclusions as to how executory contracts and unexpired leases are now to be administered because Professor Andrew apparently did not believe that Congress eliminated the *Copeland* fiction in 1978.

concerning the treatment of executory contracts and unexpired leases under the former Bankruptcy Act can be traced back to the early 19th century English case of *Copeland v. Stephens*.[31] Copeland was a lessor of real property and Stephens was his tenant. Stephens had also declared bankruptcy. Consequently, Stephens claimed that he did not owe any further rent to Copeland on the theory that the leasehold and its attendant obligation to pay rent had passed to his assignees along with the rest of his property under the bankruptcy laws.

The court disagreed, concluding instead that the assignees did not automatically lake the leasehold interest upon the commencement of the bankruptcy case, but rather took the interest only if they in fact later accepted it through some manifest act.[32] In other words, it was up to the bankruptcy assignees to decide whether to be bound or not by the particular lease, and as a consequence, it remained Stephens' obligation to pay the post-filing rent to Copeland until such an acceptance was made, if ever.

The Committee dismisses *Copeland v. Stephens* as an anomaly of English case law that had no bearing upon the development of bankruptcy law under the former Act. Committee Brief, p. 17. Indeed, the Committee suggests that executory contracts and unexpired leases immediately became property of the estate under the Bankruptcy Act just as they now do under the Bankruptcy Code because of the similarity in language between Section 541 and its counterpart under the old Act, former Section 71a. *Id.* But the case law does not support this contention. For example, in *In re Frazin*, 183 F. 28 (2nd Cir.1910), the court said:

An adjudication in bankruptcy does not dissolve or terminate the contractual relations of the bankrupt * * * Its effect is to transfer to the trustee all the property of the bankrupt except his executory contracts, and to vest in the trustee the option to assume or to renounce these.

*Id.* at 31 (quoting from *Watson v. Merrill*, 136 F. 359, 363 (8th Cir.1905)). *Frazin* then went on to add:

In our opinion, upon principle and authority, a trustee, having the option to assume or reject a lease, takes title to such lease only in case he elects to accept it. If he elects to accept it, then, by virtue of the provision of the bankruptcy act already quoted, the vesting of the title relates back to the date of adjudication. But, if the trustee does not elect to accept the lease, it remains the property of the bankrupt.

*Id.* at 32.

Indeed, the Ninth Circuit, in deciding an Act case, said this as late as 1985:

Because executory contracts and leases involve future liabilities as well as rights, however, an affirmative act of assumption by the trustee is required to bring the property into the estate in order to ensure that the estate is not charged with the liabilities except upon due deliberation. Thus, executory contracts and leases-unlike all other assets-do not vest in the trustee as of the date of the filing of the bankruptcy petition. They vest only upon the trustee's timely and affirmative act of assumption.

*Cheadle v. Appleatchee Riders Ass'n (In re Lovitt)*, 757 F.2d 1035, 1041 (9th Cir.1985) (citations omitted).

*See also, Commercial Trading Co. v. Lansburgh (In re Garfinkle)*, 577 F.2d 901,

---

**31.** (1818) 106 Eng.Rep. 218 (K.B.).

**32.** *Understanding "Rejection,"* 59 U. Colo. L.Rev. at 856–57.

905, n. 5 (5th Cir.1978) (citing 4A *Collier on Bankruptcy,* ¶ 70.44); *Fletcher v. Surprise (In re Northern Indiana Oil Co.),* 180 F.2d 669, 675–76 (7th Cir.1950) (citing *Collier on Bankruptcy* (14th Ed.)); *Reisenwebers, Inc. v. Irving Trust Co. (In re Cigar Stores Co. of America),* 69 F.2d 513, 515 (2nd Cir.1934); *Dayton Hydraulic Co. v. Felsenthall,* 116 F. 961, 965 (6th Cir. 1902) (equitable receivership case).

*Frazin* also addressed the Committee's argument regarding the apparent inconsistency between the vesting language of former Section 70a and the result in *Copeland v. Stephens.*

> It is said, however, that this conclusion is at variance with the express provision of the bankruptcy act that all the estate of the bankrupt shall vest in the trustee as of the date of the adjudication; that a leasehold interest is property and must necessarily pass with all other property. In our opinion, however, the provisions of the bankruptcy act must be read in view of the principle stated in many decisions and expressly recognized in the English bankruptcy statutes that

there is a distinction between property which may be burdensome to an estate and that which is manifestly beneficial to it. The latter, of course, passes upon the adjudication. The former passes only when accepted by the trustee; but, when accepted, the passing of title relates back to the time of the adjudication. If there be no acceptance, however, the title to a burdensome lease never passes. The property which may be said to pass immediately to the trustee in every case is not the lease itself, but the option of accepting it.

183 F. at 32.[33]

Perhaps, as the Committee argues, *Frazin* and the other pre-Code courts should have been more faithful to the specific language of former Section 70a. However, the fact remains that these courts chose instead to adopt *Copeland's* reasoning, as inconsistent as it may be, that an executory contract or unexpired lease only became property of the estate if the trustee later elected to assume it. The consequence of this decision, of course, was that the rest of the pre-Code law concerning executory

---

**33.** The *Frazin* court, then, was also interpreting whether a recent bankruptcy enactment had or had not changed the historical treatment of leaseholds in a bankruptcy proceeding. However, in *Frazin* the comparison was between the Bankruptcy Act of 1898 and its predecessor, the Bankruptcy Act of 1867. The court observed that the Bankruptcy Act of 1867 was based upon English bankruptcy law, which at that time incorporated the *Copeland* fiction of the leasehold remaining with the bankrupt unless and until the trustee made it part of the estate through its assumption. The court was also quite aware that England had eliminated the *Copeland* fiction from its bankruptcy laws sometime before the Bankruptcy Act of 1898. Nonetheless, *Frazin* concluded that Congress had chosen not to include that change in the 1898 Act but had instead intended to continue what had been the law when Congress passed the 1867 Act.

Interestingly, the *Frazin* court reached this conclusion because of the similarity between

the pertinent sections of each act and the fact that Congress had not expressed any intention in 1898 to eliminate what hud clearly become part of the 1867 bankruptcy laws—to wit, the *Copeland* fiction. *Compare, Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992) ("[T]his Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history"). But then, it is also fair to say that *Frazin* would have come to exactly the opposite conclusion had, for example, Congress said in 1898 what in fact it said in 1978, that the debtor's interest in a leasehold was now to become the estate's property immediately upon the commencement of the case. *See,* H.R.Rep. No. 95–595, at 367 (1978); S.Rep. No. 95–989, at 82 (1978).

contracts and unexpired leases was built upon this premise.

There was not, though, strict adherence to all of the outcomes *Copeland* seemed to require. For example, the logical application of *Copeland* would have permitted the landlord to refuse the bankruptcy estate continued possession of the demised premises until the trustee made his postpetition decision to accept the attendant leasehold interest as the estate's own. Nonetheless, the pre-Code courts allowed the trustee to remain in possession pending that decision. As Judge Hand observed to his apparent dismay:

> The power of a trustee in bankruptcy, and of a debtor in reorganization, to withhold leased property pending deliberation, is too well settled for debate. The often considered language in subdivision (b)(10) of section 77B (11 U.S.C.A. § 207(b)(10) presupposes it, and is built upon it, though the debtor must decide within a reasonable time, and the lessor can force it to do so, if it does not.

*Cent. Manhattan Properties v. D.A. Schulte, Inc. of New York*, 91 F.2d 728, 729 (2nd Cir.1937) (L.Hand, J.) [34]

The conundrum, then, was how to compensate the landlord for the estate's continued occupancy of the leased property when the fiction created by *Copeland* clearly did not obligate the estate to pay the rent that the debtor had previously agreed upon under the lease. Judge Hand's own solution was to treat the trustee as in effect a holdover tenant. *See, e.g., In re Manhattan Piggly–Wiggly Corp.*, 296 F. 944, 945 (S.D.N.Y.1923). As such, the trustee could remain in possession of the premises free of charge so long as the landlord did not attempt to evict him. However, if and when the landlord did make the effort, the trustee's choice would be to either remove himself from the property or begin paying rent on whatever terms he and the landlord could agree. Of course, the trustee also had the option of assuming the lease to counter the landlord's demand and, conversely, the landlord could force that decision upon the trustee by persuading the court not to give the trustee any more time to assume or reject the lease. *But, cf. Cent. Manhattan Properties*, 91 F.2d at 729.

Resolving the problem in this fashion was certainly sensible since that is how traditional landlord-tenant law would have treated a person holding possession without there being an actual lease with the property's owner.[35] Judge Hand, though,

---

**34.** The Second Circuit had earlier come to a similar conclusion with respect to a court appointed receiver's rights in a debtor's leasehold.

> It is the receiver's duty to accept as part of the estate to be administered for the creditors those assets which will prove of value to the estate. Those which are not of value are to be left outside the field of his receivership. As to those assets which are of problematical value, it is necessary that the receiver should be allowed a reasonable time within which to determine to which class of assets they belong, whether they are of the class which he should administer, or to the class which he is to let alone. In order that he may determine, for example, whether he should assume a lease belonging to the insolvent estate, he is entitled to take possession of the leased property and

operate it for a reasonable time. By the mere act of taking possession he does not adopt the lease and become bound by its covenants. He is entitled to hold for a reasonable time, to ascertain the situation of affairs, and while so holding he is not bound by the covenants of the lease.

*Johnson v. Emerson Phonograph Co.*, 296 F. 42, 45 (2nd Cir.1924) (quoting from *Am. Brake Shoe & Foundry Co. v. New York Rys. Co.*, 282 F. 523, 528 (2nd Cir.1922)).

**35.** *See, In re Macomb Occupational Health Care, LLC:*

> A "tenancy by sufferance" is similar to a tenancy at will in that its term is also indefinite and either party may terminate the tenancy at its discretion. A tenancy by sufferance is distinguished from a tenancy at will by the fact that there is no land-

did not prevail. Rather, the Second Circuit adopted a rule that soon became the law under the former Act and that still is cited again and again by modern courts—that while a landlord could not recover the agreed upon rent from the estate unless and until it actually became a party to the underlying lease through the trustee's postpetition acceptance/assumption of the same, the landlord was nonetheless entitled as a matter of equity to recover a reasonable rent from the estate for its use of the premises during the interval given for the trustee to make that decision.

For example, in the oft-cited case of *United Cigar*,[36] the landlord contended that the estate owed it rent for the entire building the debtor had leased even though the trustee's continued occupancy of the premises prior to his ultimate decision not to assume the lease had been limited to a much smaller space. The panel, which coincidently included Judge

lord/tenant relationship between the parties. The occupant of the premises simply holds possession at the "sufferance" of the owner. The common characteristic of all tenancies by sufferance is that the occupant at some prior point in time had the right to possess the premises.
The prior right to possession must have also arisen by agreement, not as a matter of law.

\* \* \*

[T]he law in Michigan is that an owner of land may not recover rent from its occupant unless there is an agreement between the parties to treat their relationship as that of a landlord and tenant. Consequently, the law in Michigan is also that an owner of land subject to a tenancy by sufferance, which by definition is not based upon a landlord/tenant relationship, may not recover rent from an occupant holding possession pursuant to the tenancy. *Hogsett v. Ellis,* 17 Mich. 351 (1868). The courts have logically concluded that an owner has no one to blame but itself for allowing a tenant by sufferance to occupy its land rent-free. If the owner wanted relief, then it had only to "suffer" the occupant's possession no more by evicting the unwanted tenant.

Hand's less famous cousin, Augustus, disagreed, and instead awarded the landlord only a reasonable rent based upon the estate's actual use. Relying upon the *Copeland* fiction, it reasoned:

> Neither chancery receivers nor trustees in bankruptcy are automatically vested with the title to leaseholds belonging to an insolvent. They take title to a lease only in case they conclude that acceptance is advantageous to the estate and elect to adopt the lease within a reasonable time. If they do so elect, the title relates back to the dale of the filing of the bill or petition. So far as they go into occupation of leased premises without adopting the lease, the landlord has a right to compensation for use and occupation out of funds in their hands. **It is an equitable right based upon the reasonable value of the use and occupation.**

*United Cigar*, 69 F.2d at 515(emphasis added and citations omitted).[37]

300 B.R. 270, 285–86 (Bankr.E.D.Mich.2003) (Hughes, J.) (footnote omitted).

**36.** *Reisenwebers, Inc. v. Irving Trust Co. (United Cigar Stores Co. of Am.),* 69 F.2d 513 (2nd Cir.1934).

**37.** Modern cases that have cited *United Cigar* as authority include *In re Rhymes,* 14 B.R. 807, 808 (Bankr.D.Conn.1981); *Gwinnett Prado, L.P. v. Rhodes, Inc. (In re Rhodes, Inc.),* 321 B.R. 80, 91 (Bankr.N.D.Ga.2005); *In re Curry Printers, Inc.,* 135 B.R. 564, 580 (Bankr. N.D.Ind.1991); *In re Xonics, Inc.,* 65 B.R. 69, 73 (Bankr.N.D.Ill.1986); *In re Patient Educ. Media, Inc.,* 221 B.R. 97, 102 (Bankr.S.D.N.Y. 1998); *In re Coastal Dry Dock & Repair Corp.,* 62 B.R. 879, 882 (Bankr.E.D.N.Y.1986); and *In re Longua,* 58 B.R. 503, 504 (Bankr. W.D.Wis.1986).
*American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.,* a subsequent Second Circuit case, also relied upon *United Cigar* when it said:
> The right to priority in the event the trustee or debtor in possession receives benefits under the contract during the interval between the filing of the debtor's petition and the rejection of the contract "is an equitable

*See also, In re Sherwoods, Inc.,* 210 F. 754, 757 (2nd Cir.1913); *Brown v. Danning (In re Fredrick Meats, Inc.),* 483 F.2d 951, 952 (9th Cir.1973); *120 Wall Associates v. Schilling,* 266 F.2d 548, 550 (2nd Cir.1959).

The legal soundness of this rule, as well as the corollary rule that the lease's assumption would "relate back" to the commencement of the case so as to make the estate then accountable for all of the post-petition actual rent incurred, was questioned even under the former Act. *See, e.g.,*

right based upon the reasonable value" of the benefits conferred, rather than upon the contract price. *In re United Cigar Stores Co.,* 69 F.2d 513, 515 (2nd Cir.1934) ... 280 F.2d 119, 125 (2nd Cir.1960).

*American Anthracite,* of course, is not a Code case. Nonetheless, it is this particular passage from *American Anthracite* that modern courts often cite as their justification for limiting administrative rent to only a reasonable amount. *See, e.g., In re Kent Holland Die Casting & Plating, Inc.,* 125 B.R. 493, 502 (Bankr.W.D.Mich.1991); *In re Hooker Invs., Inc.,* 145 B.R. 138, 145 (Bankr.S.D.N.Y.1992); *Broadcast Corp. of Georgia v. Broadfoot,* 54 B.R. 606, 610 (N.D.Ga.1985); *Kinnan & Kinnan P'ship v. Agristor Leasing,* 116 B.R. 162, 166 (D.Neb.1990); *Peninsula Gunite,* 24 B.R. at 595; *Peoples Gas System, Inc. v. Thatcher Glass Corp. (In re Thatcher Glass Corp.),* 59 B.R. 797, 799 (Bankr.D.Conn.1986); *Case Credit Corp. v. Baldwin Rental Centers, Inc. (In re Baldwin Rental Centers, Inc.),* 228 B.R. 504, 513 (Bankr.S.D.Ga.1998); *In re Bridgeport Plumbing Products, Inc.,* 178 B.R. 563, 565 (Bankr.M.D.Ga.1994); *In re Carmichael,* 109 B.R. 849, 851 (Bankr.N.D.Ill.1990); *In re Curry Printers, Inc.,* 135 B.R. 564, 579 (Bankr. N.D.Ind.1991); *Goldin v. Putnam Lovell, Inc. (In re Monarch Capital Corp.),* 163 B.R. 899, 908 (Bankr.D.Mass.1994); *In re Spectrum Info. Technologies, Inc.,* 193 B.R. 400, 407 (Bankr.E.D.N.Y.1996); *In re Ram Mfg. Inc.,* 38 B.R. 252, 254 (Bankr.E.D.Pa.1984).

**38.** Judge Hand expressed in *Piggly–Wiggly* even stronger doubts about the award of administrative rent in the absence of privity between the estate and the landlord:

When the possession of the premises passes to a receiver, the lessor must take some

*Palmer v. Palmer,* 104 F.2d 161, 163.[38] However, whatever dispute there may have been has now been resolved through the Bankruptcy Code's effective elimination of the *Copeland* fiction. But with this change in the law must also come the consequence that seemed so obvious to Judge Hand years ago in *Palmer*—that the estate, as the successor tenant, must also "fulfill the conditions imposed upon the [lease's] term," including the payment of the agreed upon rent, should the estate "hold the premises even temporarily," for that is the essence of "property *cum onere.*" 104 F.2d at 163.[39]

action, or agree with the receiver, else he consents to the status quo. Indeed, the receiver was under no obligation to pay the December rent, and would be properly surcharged with it in his accounts. It has indeed been the custom for receivers to pay rent without any agreement, or any proceedings taken by the lessor; but the practice is a loose one, and cannot justify disregarding the well-fixed rights of the parties when they insist upon them.

296 F. at 945.

**39.** Interestingly, *Palmer* is frequently cited by modern courts as yet another Act case supporting the proposition that the administrative rent to be awarded in connection with a rejected lease is to be limited to only the benefit realized by the estate. *See, e.g., In re GHR Energy Corp.,* 41 B.R. 668, 670 (Bankr. D.Mass.1984); *In re Mr. Gatti's, Inc.,* 164 B.R. 929, 934 (Bankr.W.D.Tex.1994). However, while Judge Hand did concede in *Palmer* that the recognized law was just as he had described it, he did so only reluctantly. Indeed, he followed his concession with this musing:

Be that as it may, the trustee need not pay the rent during the probationary period, and the court will hold off the lessor, and force him to be content with the value of the use and occupation meanwhile, though ordinarily it will fix that at the same amount as the rent. This was the result in *Quincy, etc., R. Co. v. Humphreys,* 145 U.S. 82, 12 S.Ct. 787, 36 L.Ed. 632, and in *United States Trust Co. v. Wabash Railway,* 150 U.S. 287, 14 S.Ct. 86, 37 L.Ed. 1085, though so many other circumstances were

## (c) Early Bankruptcy Code Authority

As already mentioned, cases decided under the Bankruptcy Code have adopted the former Act rule of limiting administrative rent on a rejected lease to only a reasonable value by either citing former Act decisions directly or citing more current decisions that in turn derive their authority from pre-Code cases. Not surprisingly, many of these decisions were rendered when the Bankruptcy Code was still relatively new and memories of what had been the rule under the former Act were still fresh. For example, in the early case of *In re Rhymes*, the court declared:

> With respect to unexpired leases, it is well settled that until assumption or rejection of the debtor's lease, the estate is liable only for the reasonable value of the use and occupancy of the property. *In re United Cigar Stores Co.*, 69 F.2d 513 (2d Cir.), cert. denied sub nom. *Reisenwebers, Inc. v. Irving Trust Co.*, 293 U.S. 566, 55 S.Ct. 76, 79 L.Ed. 665 (1934); *In re Standard Furniture Co.*, 3 B.R. 527, 6 B.C.D. 270 (Bkrtcy.S.D.Cal. 1980); 2 Collier on Bankruptcy Par. 365.03(2) (15th ed.1979); See 3 Collier on Bankruptcy Par. 503.04(1)(a) (15th ed.1979). The liability for actual use and occupancy is based on "the equitable principle of preventing unjust enrichment, rather than the compensation of the creditor for loss to him." *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 126 (2d Cir.1960).

14 B.R. 807, 808 (Bankr.D.Conn.1981) (emphasis added).

And in the even earlier case of *In re Standard Furniture Co.*, the court said this:

> It is well settled, however, that where a lease is ultimately rejected, or for the period pending either rejection or assumption, the amount of allowable expense for administrative rent is measured by the period of actual occupation and use of the premises. See *Philadelphia Co. v. Dipple*, 312 U.S. 168, 174, 61 S.Ct. 538, 541, 85 L.Ed. 651 (1941) (reorganization case); *Matter of Chase Commissary Corporation, supra*, 11 F.Supp. at 289; *In re CRS Architectural Metals Corp.*, 1 B.R. 729, 732 (Bankr.E.N.Y. 1979).

3 B.R. 527, 530 (Bankr.D.Cal.1980).

Unfortunately, these cases, like *United Cigar*, figured prominently in the later decisions of other courts as they too were called upon to address the issue. For example, in *GATX Leasing Corp. v. Airlift Int'l Inc. (In re Airlift Int'l Inc.)*, the Eleventh Circuit said:

> Where the debtor is a lessee, the estate is liable for the reasonable value of the use and occupancy of the property during the period between filing and assumption or rejection of the unexpired lease. See *In re Rhymes, Inc.*, 14 B.R. 807, 808 (Bkrtcy.D.Conn.1981); 2 *Collier on Bankruptcy*, ¶ 365.03[2] (15th ed.1979).

761 F.2d 1503, 1508 (11th Cir.1985) (emphasis added).

And in *Braniff Airways*, the Fifth Circuit said:

thought relevant that we are not clear as to the precise scope of either ruling. But we have ourselves a number of times declared that the trustee's title 'relates back', or that he is liable only for use and occupation, and in some instances what we said was necessary to the result. Whether justified in principle or not, the doctrine has by now become too well fixed to be uprooted, especially since no change was made when the whole subject was overhauled in the Chandler Act.

If the trustee assumes the lease, the debtor's estate becomes liable for the full rent accruing under the terms of the lease. *In re Florida Airlines, Inc.*, 17 B.R. 683, 684 (Bankr.M.D.Fla.1982). If the trustee ultimately rejects the lease the debtor's estate is liable only for the reasonable value of its use and occupancy of the premises. The lessor is entitled to receive administrative expense priority for that amount (*see* §§ 503 and 507(a)(1) of the Bankruptcy Code) which is ordinarily presumed to be the contract rental rate, adjusted downward or upward to reflect the extent to which the debtor actually used the demised premises. *In re Energy Resources Co., Inc.*, 47 B.R. 337, 338–39 (Bankr.D.Mass. 1985); *Dallas–Fort Worth Regional Airport Board v. Braniff Airways, Inc.*, 26 B.R. 628, 630–31 (N.D.Tex.1982) [hereinafter cited as *DFW Regional Airport Board* ]; *In re Standard Furniture Company*, 3 B.R. 527, 530 (Bankr. S.D.Cal.1980); *see generally* Fogel, Executory Contracts and Unexpired Leases in the Bankruptcy Code, 64 Minn. L.Rev. 341, 365–71 (1980).

*In re Braniff Airways,* 783 F.2d at 1285–86 (emphasis added).[40]

*Id.*

**40.** *See also, In re Dixie Fuels, Inc.*, 52 B.R. 26, 27 (Bankr.N.D.Ala.1985); *In re Bridgeport Plumbing Products, Inc.*, 178 B.R. at 565; *In re Mr. Gatti's, Inc.*, 164 B.R. at 934; *In re GHR Energy Corp.*, 41 B.R. at 670; *Varon v. Trimble, Marshall & Goldman, P.C. (In re Euro–Swiss Int'l Corp.)*, 33 B.R. 872, 888 (Bankr.S.D.N.Y.1983); *In re Int'l Storage Corp.*, 41 B.R. 808, 809 (Bankr.E.D.Wis. 1984); *In re Gamma Fishing Co., Inc.*, 70 B.R. 949, 954 (Bankr.S.D.Cal.1987); *In re Woods Farmers Coop. Elevator Co.*, 107 B.R. 694, 697 (Bankr.D.N.D.1989); *In re Glinz*, 1985 WL 660825 at *6 (Bankr.D.N.D.1985); *TN Commc'ns Corp. v. Adwar Video Corp. (In re Adwar Video Corp.)*, 38 B.R. 628, 629 (Bankr.S.D.N.Y.1984); *In re Gourmet Gallery, Inc.*, 27 B.R. 912, 914 (Bankr.E.D.Pa.1983); *In re Florida Airlines, Inc.*, 17 B.R. 683, 685 (Bankr.M.D.Fla.1982); *In re Lackow Bros. Inc.*, 18 B.R. 770, 772 (Bankr.S.D.Fla.1982); *In re Phar–Mor, Inc.*, 290 B.R. 319, 322 (Bankr.N.D.Ohio 2003); *In re Grimm & Rothwell, Inc.*, 108 B.R. 186, 190 (Bankr.S.D.Ohio 1989); *In re Tucci*, 47 B.R. 328, 333 (Bankr. E.D.Va.1985); *Dallas–Fort Worth Reg'l Airport Bd. v. Braniff Airways, Inc.*, 26 B.R. 628, 631 (N.D.Tex.1982); *In re Cole*, 189 B.R. 40, 48 (Bankr.S.D.N.Y.1995); *In re Sweetwater*, 40 B.R. 733, 745 (Bankr.D.Utah 1984); *Harris Int'l Telecomms., Inc. v. Three Star Telecast, Inc. (In re Three Star Telecast, Inc.)*, 73 B.R. 270, 274 (Bankr.D.P.R.1987).

### (d) *Fred Sanders Company*

Indeed, of the myriad opinions written since the Code's enactment, only *In re Fred Sanders Company*, 22 B.R. 902 (Bankr.E.D.Mich.1982), actually recognized that the former Act's approach to unexpired leases had changed. *Sanders* involved three vans that had remained in the bankruptcy estate's possession for almost a year before their underlying leases were finally rejected. Fruehauf Corporation, the lessor, then filed an administrative claim for the postpetition rent due on the vans. However, the debtor-in-possession objected, contending instead that nothing was owed as administrative rent because it had not used the vans since the commencement of the case.

Unlike the other courts, the *Sanders* court both understood why pre-Code cases like *United Cigar* had awarded reasonable rent as opposed to the agreed upon rent:

In cases involving equity receiverships, courts maintained that since a receiver was not in privity of contract with the lessor, he did not "become liable on existing leases merely by appointment or temporary occupation." *In re Chase Commissary Corp.*, 11 F.Supp. 288, 289 (S.D.N.Y.1935); Pomeroy, Equity Jurisprudence s 1624 (4th Ed.1919). He became liable on the lease only if he

adopted the lease. *In re United Cigar Stores Co.*, 69 F.2d 513 (2d Cir.1934).

*Id.* at 903.

and, equally important, why that reason no longer existed under the newly enacted Bankruptcy Code:

> There is no need to resort to the fiction of delayed vesting under the Code to reach the result that a trustee is not bound by an existing lease until he affirmatively adopts the lease. The debtor's estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the estate." s541. The legislative history states that the "debtor's interest in property also includes 'title' to property, which is an interest, just as are a possessory interest, or a leasehold interest." Clearly, therefore, upon the filing of the bankruptcy petition, a lease becomes property of the estate.

*Id.* at 904 (citations omitted).

But the *Sanders* court did not consider this change as having a material affect upon the *United Cigar* approach to awarding administrative rent:

> Section 541, however, must be read in conjunction with section 365(a), which provides that the debtor may assume or reject any existing lease. The right to assume presupposes that assumption does not automatically take place upon the filing of the bankruptcy petition, and the right to reject presumes the existence of something which can be rejected. The apparent conflict between section 541 and section 365 is readily reconcilable. A lease has two aspects—the lessee's right to possession and use, and his correlative obligation to make the agreed-upon lease payments. The debtor lessee's right to possession and

use of the leased property becomes part of the estate. The debtor, however, is not liable for the payments provided for under the lease until the lease is assumed. Until the lease is assumed, the estate is liable only for the reasonable value of the leased property—the same obligation which existed under equity receiverships and the Bankruptcy Act. 2 Collier Bankr.P 365.03(2) (15th ed.1982).

*Id.* at 904–5.

The deficiency in *Sanders'* reasoning, though, is its attempt to reconcile Sections 541 and 365 with respect to the question of administrative rent when in fact no reconciliation is required. Indeed, *Sanders* itself acknowledges that among all the rules that Section 365 now provides for the estate's administration of executory contracts and unexpired leases, none can be found that addresses the "reasonable value" question.

> Section 365 sets forth detailed rules for the treatment of executory contracts and unexpired leases. Unfortunately, however, it does not address the "reasonable value" question.

*Id.* at 905, n. 7.

In addition, *Sanders'* dissection of the leasehold acquired by the estate into a possessory right and a separate obligation to pay rent not only lacks any supporting citation but also is contrary to the rule that the Supreme Court had enunciated only three years earlier in *Butner*[41] and that Congress had again declared in connection with the just as recently enacted Bankruptcy Code[42]—that the estate cannot acquire greater rights in property than what the debtor himself enjoyed. Consequently, *Sanders'* "reconciliation" leaves unanswered the crucial question raised by

---

41. 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

42. H.R.Rep. No. 95–595, at 367–68 (1978), *as reprinted in* 1978 U.S.C.CA.N. 5963, 6323; S.Rep. No. 95–989, at 82 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5868.

Judge Hand in *Palmer*—how can the bankruptcy estate for a moment claim the right of possession under a lease without also honoring the same terms as had the debtor prior to the case's commencement? 104 F.2d at 163. Granted, as will be shown, the automatic stay will permit the estate's continued possession notwithstanding the estate's failure to actually pay the corresponding rent as it comes due. However, neither the automatic stay, nor for that matter Section 365, is capable of exonerating the estate from ultimately having to account for the postpetition rent that nonetheless accrued.

*Sanders* creates other analytical challenges as well. For example, if, as *Sanders* concludes, the demised premises are "separated" from the attendant obligation to pay rent until the lease is assumed, then it is reasonable to ask why the estate should pay any rent at all during this interval if the lease is ultimately rejected. In other words, why should this "separate" property be administered differently than any other property that is not subject to an encumbrance? As for the lease's "detached" liability, it seems equally clear under the *Sanders'* construct that the landlord's recourse at most would be its right to compel the trustee to make his decision to assume or reject the underlying lease sooner than he might otherwise choose.

And finally, *Sanders* lacks historical perspective, for it ignores the very reason why the pre-Code courts awarded lessors only reasonable rent in the first place. Again, as *Sanders* itself recognized, the delayed vesting of a lease under the *Copeland* fiction left the lessor with no recourse against the estate for rent since the estate was not in privity unless and until the lease was ultimately assumed. *Id.* at 903. Therefore, *United Cigar* and other pre-Code courts utilized their equitable powers to at least award the lessor a reasonable rent for the estate's continued enjoyment

of the subject property while the decision to assume the lease or not was being made. But, as *Sanders* should have realized, this equitable reason disappeared with the Code's enactment, for its elimination of the *Copeland* fiction meant that the estate would in fact be in privity with the lessor from the very outset of the case. Indeed, it is difficult to understand why *Sanders* did not comprehend that the estate's immediate privity with the lessor placed into question its own unsupported conclusion that only a reasonable rent was due, for *Sanders* also quoted this from a much earlier Sixth Circuit decision.

> A court of equity will not suffer an injustice to be done a lessor by acts or conduct which amount equitably to an exclusion of the lessor from the premises, and an appropriation of them to the supposed benefit of the trust.

*Dayton Hydraulic Co.,* 116 F. at 966.

That citation then was followed by *Sanders'* own much more memorable observation:

> The view that the estate should be liable only for the debtor's actual use or occupancy is based, in part at least, upon the premise that expenses of administration are to be minimized. **The desire to keep a lid on expenses of administration is laudable, but an estate is not to be maintained for the debtor or creditors at the expense of those who have valid charges against property of the estate.**

*Id.* at 906 (emphasis added).

But if "what is sauce for the goose is sauce for the gander," it would certainly seem that *Sanders'* admonition is equally applicable to its own conclusion that only a reasonable rent is owed given the Code's elimination of the *Copeland* fiction and the resulting privity that now immediately exists between the lessor and the bankruptcy estate.

### (e) Broadfoot and Templeton

*Sanders* prompted a considerable debate among the courts over the allowance of administrative rent under the Code. That debate, though, was not what this court would have expected. Rather, it was over whether the rent awarded should always be the property's fair rental value, which is what *Sanders* ultimately held, or whether it should it be further limited to only the debtor's actual postpetition use of the same. For example, this is how the court in *In re Templeton* described the ensuing discussion:

> There are two lines of cases regarding the granting of administrative priority status to post-petition rents to the rejection of an unexpired lease. One line of cases holds that a creditor may be granted an administrative priority expense for post-petition rental claims even where the estate does not benefit from the possession of the creditor's property. The other line of cases, adopted by this court, requires that the bankruptcy estate must benefit from the use of the creditor's property to be granted an administrative priority claim.

154 B.R. 930, 932 (Bankr.W.D.Tex.1993) (citations omitted).[43]

*Broadcast Corp. of Georgia v. Broadfoot* is generally regarded as the seminal case rejecting the *Sanders* approach. 54 B.R. 606 (N.D.Ga.1985) (*"Broadfoot I"*), *aff'd sub nom Subscription Television of Greater Atlanta,* 789 F.2d 1530 (11th Cir.1986) (*"Broadfoot II"*). Not surprisingly, *Bro-adfoot I* begins with its own misplaced citation to pre-Code case authority.

> It is well established that once an executory contract or lease is rejected, the creditor may file an administrative claim for the "reasonable value of the use or occupation" by the trustee of the creditor's assets during the time before rejection.

*Id.* at 609 (citations omitted).[44]

Ignored by both appellate courts, though, is what only *Sanders* among all of the courts correctly realized—that the enactment of the Bankruptcy Code had eliminated the very reason for this rule to have been established.

Moreover, *Broadfoot* involved an executory contract, not an unexpired lease.[45] The debtor there offered a subscription television service that required Broadcast to transmit the debtor's scrambled signal to the debtor's subscribers during certain hours of each day. The debtor utilized this service during the entire course of its aborted Chapter 11 case and the Chapter 7 trustee also utilized it for seventeen days once the case was converted. The Chapter 7 trustee, though, never actually rejected the contract and, as a consequence, the contract was not "deemed" rejected until the sixtieth day from conversion. *See,* 11 U.S.C. §§ 365(d)(1) and 348(a). Consequently, Broadcast contended that it was entitled to reimbursement for the entire sixty days because its contract with the debtor prohibited it from offering the signal to anyone else as long as the contract

---

**43.** *See also, In re Mohawk Indus., Inc.,* 54 B.R. 409, 411–12 (Bankr.D.Mass.1985).

**44.** Of the six cases *Broadfoot I* cites for this proposition, three are actually Act cases—*Dipple,* 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651; *Palmer,* 104 F.2d 161; *Cochise College Park,* 703 F.2d 1339. As for the other three, *Rhymes,* 14 B.R. 807, *GHR Energy Corp.,* 41 B.R. 668, and *In re By–Rite Distrib., Inc.,* 47 B.R. 660 (Bankr.D.Utah 1985), these cases either themselves cite Act cases or cite Code cases that in turn rely upon Act cases.

**45.** The court therefore finds that the mere failure by a Chapter 7 trustee to reject or assume an executory contract during the 60–day period is not a use for which the nondebtor contracting party is entitled to priority compensation.

*Id.* at 612.

remained in effect. The Chapter 7 trustee, of course, asserted that the estate should be charged for only the seventeen days the signal was actually used.

Although the bankruptcy court agreed with Broadcast, both the district court and the Eleventh Circuit found for the Chapter 7 trustee on appeal. In arriving at this conclusion, both appellate courts relied heavily upon the fact that Broadcast had not provided any benefit to the estate for the forty-three day interval between when the Chapter 7 trustee actually stopped using Broadcasts' services and when the executory contract was finally deemed rejected.

> As the district court held, ... "there must be an actual, concrete benefit to the estate before a claim is allowable ..." as an administrative expense. *Broadcast Corp. of Georgia v. Broadfoot*, 54 B.R. at 613.

*Broadfoot II*, 789 F.2d at 1532.[46]

However, this court submits that both *Broadfoot I* and *II* could have arrived at the same conclusion without glossing the "actual" and "necessary" language of Section 503(b)(1)(A) with the addition of "benefit." Think of it this way. The bankruptcy estate's right in *Broadfoot* to demand that Broadcast provide the signal under the executory contract was the only "property" that became part of the estate, and therefore it was only that right that might need to be preserved for the estate. That right in turn was reinforced with the estate's ability, again as the debtor's assignee, to sue Broadcast for damages, and perhaps even specific performance, if Broadcast refused without justification.

Consider, then, whether Broadcast did anything during the remaining forty-three days before the contract was finally deemed rejected that could be recognized as either actual or necessary for the preservation of that right and accompanying remedy. Granted, Broadcast may have, as it claimed, forgone during this interval an opportunity to provide the same signal to another customer and, as a consequence, suffered damages. However, from the estate's perspective, whether Broadcast had or had not done so would have made no difference since the estate would still have preserved the right during that forty-three days to demand the use of that signal upon the threat of a lawsuit if Broadcast refused. Or, to put it differently, Broadcast had done nothing during the remaining forty-three day interval that was either actual or necessary to the preservation of the estate's right under that executory contract to demand the resumption of the promised services, either with or without the assistance of Section 365(b)(1). Therefore, Broadcast was not entitled to priority treatment for what ultimately became only part of Broadcast's Section 502(g)(1) prepetition rejection claim.[47]

---

**46.** What the district court had previously held is this:

> First, the *Sanders* Rule is contrary to the relevant statutory description of administrative expenses. 11 U.S.C. § 503(b)(1)(A) provides that such expenses include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case...." The use of the words "actual" and "necessary" indicate that the estate must accrue a real benefit from the transaction for which the claim is being filed. The mere potential of benefit to the estate does not satisfy this requirement. *In re Kessler*, 23 B.R. 722, 724 (Bkrtcy.S.D.N.Y.1982).

> *Broadfoot I*, 54 B.R. at 611.

**47.** Of course, the chance that the Chapter 7 trustee might call upon Broadcast to once again perform under the contract would have disappeared when it Finally was deemed rejected on the sixtieth day. Broadcast could have also avoided the uncertainty of the remaining forty-three days had it been able to compel the contract's rejection during the prior Chapter 11 proceeding. 11 U.S.C. § 365(d)(2).

But, as has already been established, an unexpired lease is not an executory contract and, as such, what is actual and necessary for the preservation of one is not necessarily what is actual and necessary for the preservation of the other. In other words, while the Chapter 7 trustee in *Broadfoot* did not have to pay anything in the interim to the broadcaster in order to preserve the estate's rights to later demand the resumption of service under the executory contract involved there, the payment of rent is in fact absolutely necessary if the estate's possession of the demised property is to be preserved under an unexpired lease, which is the case here. Again, as Judge Hand said:

> [I]t would be a little hard to see by what power the court could keep a trustee in possession while he was determining his course, without compelling him meanwhile to fulfill the conditions imposed upon the term; for instance, the payment of any rent, secured by a right of reentry.

*Palmer,* 104 F.2d at 163.

Unfortunately, the courts that have since extended *Broadfoot I* and *II* to cases involving unexpired leases have not appreciated this distinction. Take, for example. *In re Templeton,* which involved a Chapter 12 farmer's lease of a tractor and plow from the bank.[48] The bankruptcy court in that case refused the bank any administrative rent for the postpetition period prior to the lease's rejection on the basis that the debtor had not used the equipment during that interval. In rejecting *Sanders* and adopting *Broadfoot,* the *Templeton* court concluded that *Sanders* ran "afoul" of the plain meaning of Section 503(b)(1)(A):

> The Supreme Court has recently noted that bankruptcy courts should interpret the Bankruptcy Code with a view to enforcing the statute's plain meaning.

A plain reading of section 503(b)(1)(A) indicates that expenses must be "actual and necessary" to be allowed as administrative expenses. Courts have concluded that the use of the words "actual and necessary" in the administrative priority section requires that there must be a real benefit to the estate from the transaction.

*Id.* at 933–34 (citations omitted).

*Templeton* then quoted this passage from *In re Carmichael:*

> The language of § 503 continues the longstanding rule under the former Bankruptcy Act that a creditor's right to payment will be afforded priority only to the extent the estate was benefited in fact from the consideration supporting the creditor's claim. *See, American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.,* 280 F.2d 119 (2nd Cir.1960); *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir.1976).

109 B.R. at 851.

However, with all due respect, it is *Templeton* and, for that matter, *Carmichael* that run afoul of Section 503(b)(1)(A), for each restricts the "actual" and "necessary" requirements of that section with the further judicially imposed requirement that the subject expense be of some "real benefit" to the estate. Courts, though, are not empowered to embellish what Congress has written. For example, in *Lamie v. United States Trustee,* the Supreme Court itself refused to add language to Section 330(a) even though it appeared there that Congress had erred in drafting that section.

> Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding. It results from "deference to the supremacy of the Leg-

---

48. 154 B.R. at 932.

islature, as well as recognition that Congressmen typically vote on the language of a bill."

540 U.S. 526, 538, 124 S.Ct. 1023, 1032, 157 L.Ed.2d 1024 (2004) (citations omitted).

It stands to reason then, that the Court would be even less amenable to adding language to a section that is not so handicapped, as is the case here.

Moreover, *Templeton* and *Carmichael* create the false impression that Section 503(b)(1)(A) is nothing more than a codification of *American Anthracite* and the reference therein to benefit having to be conferred upon the estate. However, the former Bankruptcy Act had its own section concerning the allowance of administrative expenses which was almost identical to Section 503(b)(1)(A).

> The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition: ...

Former Section 64a(1), 11 U.S.C. § 104 (repealed).

Consequently, it is fair to assume that if "benefit" is to now be read into Section 503(b)(1)(A), and if *American Anthracite* is the authority for that interpretation, then *American Anthracite* would have interpreted former Section 64a(*l* ) in exactly the same manner. That is, *American Anthracite* itself would have said "[t]he use of the words 'actual' and 'necessary' [in former

Section 64a(1)] indicate that the estate must accrue a real benefit from the transaction for which the claim is being filed," just as the district court had done in *Broadfoot I.* 54 B.R. at 611. But, *American Anthracite* does not offer that analysis. Rather, its conclusion concerning benefit as being a prerequisite to administrative priority derives entirely from *United Cigar* and the equitable remedy that that earlier case had created to address the peculiar problem of administrative rent under the former Act.

> The right to priority in the event the trustee or debtor in possession receives benefits under the contract during the interval between the filing of the debtor's petition and the rejection of the contract 'is an equitable right based upon the reasonable value' of the benefits conferred, rather than upon the contract price.

*American Anthracite*, 280 F.2d at 124.

And *American Anthracite* again cites *United Cigar* for this proposition.

> These principles have most often been applied by the courts with respect to leases of real property. In such cases it is said that, unless the trustee or debtor in possession elects to assume the duties of the bankrupt lessee under the lease, he is liable only for actual use and occupancy of the property.

*Id.* at 125.[49]

Put simply, *Templeton* and *Carmichael* cannot reshape *American Anthracite* and similar pre-Code cases to justify what they now want to read into Section 503(b)(1)(A).

---

**49.** Granted, *American Anthracite* does then extend the reasoning in *United Cigar* from just "contracts for the lease of real property" to "other kinds of contracts." *Id.* However, that extension cannot be read as a broadening of former Section 64(a)(1). Rather, it is nothing mote than the Second Circuit's recognition that other parties might also need the equita-

ble remedy it had previously provided to landlords in *United Cigar.* Indeed, *American Anthracite* justified its expansive reading of *United Cigar* with the observation that "priority has in fact been accorded to claims for use by the trustee of personal property leased to the bankrupt." *Id.* (citing *Mathews v. Butte Mach. Co.,* 286 F. 801 (9th Cir.1923)).

Rather, the "longstanding rule" these cases supposedly establish is in fact an anachronism of a former era that was compel led by a legal fiction that no longer exists. Indeed, it is ironic that the modern courts have relied so heavily on *American Anthracite* as justification for limiting administrative rent and even denying it altogether when *American Anthracite* in fact refers to equitable principles used back then to ensure that the landlord would receive at least something as administrative rent when the prevailing law at that time otherwise said that the landlord should receive nothing.

### 3. *The Bankruptcy Code*

■ Although Judge Hand's reasoning in *Palmer* leads to the inescapable conclusion that the modern bankruptcy estate, as the immediate successor to the debtor's burdened rights under an unexpired lease, is obligated to pay the actual rent as it continues to come due under that lease, the concept that underlies that conclusion—i.e., a neutral transfer of the leasehold from the debtor to the estate—is itself qualified by whatever the Bankruptcy Code might otherwise provide. *See, e.g., Butner v. U.S.*, 440 U.S. at 54, 99 S.Ct. at 918. Consequently, the Committee's position is still salvageable if, as it maintains, a specific provision of the Bankruptcy Code itself requires Fifth Third's administrative rent to be pared down from whatever otherwise it is owed as postpetition rent under the lease with Debtor.

### (a) *The Automatic Stay and Section 365(d)(5)*

There is no question that the Code gives the bankruptcy estate rights against the lessor beyond those provided under the lease itself. Perhaps the most obvious of these rights is the estate's ability to remain in possession notwithstanding an underlying default in either the payment of rent or some other obligation. It is, of course, tempting to think of Section 365 as itself affording this additional protection. However, as already explained, that section speaks only to how the estate can eliminate that default in the event the trustee elects to assume the lease and continue enjoying the exclusive possession of the property it involves. *Cf.* 11 U.S.C. § 365(b).

■ It is instead Section 362(a)(3)'s blanket prohibition of all acts to dispossess the estate of its property, including leasehold interests, that provides this protection. For example, a debtor's previous failure to pay rent, no matter how substantial, is of no consequence to the bankruptcy estate's own continued enjoyment of the leased property once it has become the estate's property so long as the Section 362(a)(3) stay remains in place. However, while the automatic stay certainly will keep the estate in possession notwithstanding its failure to pay postpetition rent when due, neither the stay, nor for that matter, Section 365 prohibits postpetition rent from continuing to accrue on the underlying lease. Moreover, whatever rent does accrue would unquestionably be the estate's obligation to pay given that the estate under the Bankruptcy Code is now immediately assigned the tenant's responsibilities when a case is commenced. Or, as Judge Hand astutely observed in *Palmer*.

> [I]t would be a little hard to see by what power the court could keep a trustee in possession while he was determining his course, without compelling him meanwhile to fulfill the conditions imposed upon the term; for instance, the payment of any rent, secured by a right of reentry.

104 F.2d at 163.

This last point is particularly important because distinguishing between the estate's failure to pay postpetition rents when due and the accrual of those same

rents in any event is crucial to understanding the subsequent additions of Sections 365(d)(3) and (d)(5) to the Bankruptcy Code. Lessors were frustrated soon after the Code's enactment with the willingness of many courts to leave the estate in possession of leased property with only the trustee's assurance that they would eventually be reimbursed as an administrative claimant against the estate. *See, e.g., In re Handy Andy Home Improvement Ctrs., Inc.*, 144 F.3d 1125, 1128 ("At the same time that the automatic stay would prevent the landlord from evicting the tenant, . . . the 'actual, necessary' provision of Section 503(b)(1), at least as interpreted by many courts . . ., might prevent the landlord from collecting the rent in full, promptly, and without legal expense") (citations omitted).

But in 1984 commercial landlords prevailed upon Congress to add Section 365(d)(3), which reads as follows:

> The trustee shall timely perform all the obligations of the debtor, . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

And in 1994 what is now subsection (d)(5)[50] was added for lessors of commercial equipment:[51]

> The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title.[52]

The Committee cites a line of cases where the courts have read these two subsections as creating a new administrative claim for actual rent that stands apart from the priority claim that landlords and lessors are otherwise entitled to under Section 503(b)(1)(A).[53] The Committee

---

50. The 1994 amendment originally appeared as Section 365(d)(10). However, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 eliminated a number of prior subsections to Section 365(d), thereby resulting in Section 365(d)(10) being renumbered as Section 365(d)(5).

51. Section 365(d)(5) in fact covers all unexpired leases "of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes)." Nonetheless, Section 365(d)(5) leases will be referred to as "commercial equipment leases" or "equipment leases" for purposes of convenience.

52. Section 365(d)(5)'s sixty-day "gap" is the feature that most distinguishes that subsection from Section 365(d)(3). However, Section 365(d)(5) is also distinguished from Section 365(d)(3) by its application to only Chapter 11 cases and by a court's ability to override its requirements "based on the equities of the case."

53. The argument for Sections 365(d)(3) and (d)(5) creating their own administrative priorities is ably made in *In re Compuadd Corp.*, 166 B.R. 862, 865 (Bankr.W.D.Tex.1994). *See also, In re Kyle Trucking, Inc.*, 239 B.R. 198, 201–02 (Bankr.N.D.Ind.1999) and *Cukierman v. Uecker (In re Cukierman)*, 265 F.3d 846, 850 (9th Cir.2001). I, though, rejected this argument in *Palace Quality.* 283 B.R. at 873–78. My rejection of *Compuadd* in part paralleled the analysis used by similar-minded courts such as *In re JAS Enterprises, Inc.*, 180 B.R. 210 (Bankr.D.Neb.1995) and *Mr. Gatti's* that is, that nothing in either Section 365(d)(3) or (d)(5) remotely suggests that either of those two subsections creates an independent right to priority treatment whereas Section 503(b)(1)(A) suits the purpose just fine. However, a critical element of my analysis also focused on an irreconcilable conflict between Sections 365(d)(5) and 348(d) if the former section is read to create its own administrative priority. One other court has also acknowledged this conflict but chose instead to ignore it. *In re Eastern Agri–Systems,*

then reads into this interpretation a silent reaffirmation by Congress that commercial equipment lessors like SEET Connecticut are still kept to the supposed reasonable rent rule of Section 503(b)(1)(A) because of the sixty-day exception under Section 365(d)(5). But what has escaped both the Committee and these courts is the fact that the lessor's recovery of an administrative claim had nothing to do with either of these subsections' enactment. To the contrary, it was the promise of being awarded an administrative claim in lieu of being able to actually evict the nonpaying estate that was particularly vexing to commercial landlords and equipment lessors alike. Cf. Handy Andy, Id. Lest there be any doubt, consider as well Senator Hatch's comments in support of Section 365(d)(3):

A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all the tenants according to the amount of the space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor. The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

130 Cong. Rec. S8887, S8894–95 (daily ed. June 29, 1984) (statement of Sen. Hatch).

Subsections 365(d)(3) and (d)(5), then, are nothing more than triggers that facilitate the recovery of leased commercial property in the event the trustee fails to comply with the requirements imposed by those subsections. As the court in *JAS Enterprises* correctly stated:

Sections 365(d)(3) and 503(b)(1) can and should be read as consistent with and complimentary to each other. The express language of § 365(d)(3), namely the language "notwithstanding § 503(b)(1)", does not conflict with § 503(b)(1), and does not indicate priority independent of § 503. Section 365(d)(3) simply places a burden on the debtor-in-possession to perform; it does not bestow administrative expense status benefits upon the non-debtor party if the debtor-in-possession does not perform. Administrative expenses are left to § 503. Similarly, § 365(d)(3) does not provide a remedy if the debtor-in-possession fails to comply with the obligations of the debtor under the lease. Remedies are provided in other Bankruptcy Code sections such as §§ 362(d)(1), 363(e), and 1112(b).

180 B.R. at 218 (citations omitted).

*See also, CIT Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 235–36 (4th Cir.2005); *Mr. Gatti's, Inc.*, 164 B.R. at 936; *Great W. Savings Bank v. Orvco, Inc. (In re Orvco, Inc.)*, 95 B.R.

___

*Inc.*, 258 B.R. 352, 355 (Bankr.E.D.N.C. 2000). However, as explained in *Palace Quality,* ignoring a statutory conflict that arises from a proposed interpretation is not a

solution, especially when the alternative interpretation being considered is harmonious. 283 B.R. at 873–78.

724 (9th Cir.BAP1989); *In re Laurence R. Smith, Inc.,* 127 B.R. 715, 716 (Bankr. D.Conn.1991); *In re Tammey Jewels, Inc.,* 116 B.R. 292, 294 (Bankr.M.D.Fla. 1990); *In re The Bedroom of Cent. Florida, Inc.,* 150 B.R. 982, 984 (Bankr. M.D.Fla.1993).

Indeed, the Committee appears to agree with *JAS Enterprises'* conclusion, at least as it relates to the first sixty days.

> In fact, with the exception of your Honor's decision in *In re Palace Quality Servs., Indus. Inc.,* ... every court that our research discovered to consider the nature of a commercial personal-property lessor's entitlement to postpetition payment within the first 60 days of the bankruptcy case **looks to § 503** ....

Committee Brief, p. 9 (emphasis added).

Of course, the negative implication is that courts should not look to Section 365.

■ To summarize, then, Section 365(d)(5) certainly obligates the trustee to actually pay the equipment lessor the agreed upon rent as it comes due under the lease for whatever interval follows the first sixty days. Similarly, Section 365(d)(5) clearly entitles the equipment lessor to have the stay immediately lifted "notwithstanding § 503(b)(1)" in the event the trustee does not perform as that sub-section requires. However, Section 365(d)(5) says nothing about the entirely different question of what the equipment lessor should later receive as administrative rent under Section 503(b)(1)(A) for those months when either (a) Section 365(d)(5) itself has excused the trustee from having to timely pay the rent when otherwise due; or (b) the trustee simply did not pay the required rent but nonetheless enjoyed the undeserved benefit of the lessor's own failure to take advantage of the trustee's default. Therefore, if the estate in this instance is to be relieved from paying the first two months of postpetition rent that both the lease agreement and non-bankruptcy law quite clearly require, the estate must rely upon some Code provision other than Section 365(d)(5).

### (b) *Sections 502(g)(1) and 365(g)(1)*

While Sections 362, 365 and 503 together address the lessor's postpetition relationship with the estate, Section 502(g)(1) addresses the separate issue of the lessor's prepetition claim against the estate in the event the lease is rejected.[54] That section, in pertinent part, provides:

> A claim arising from the rejection, under section 365 of this title or under a plan

---

**54.** Another subpart of Section 502 then addresses the amount that a lessor of real property may claim as prepetition damages once the lease has been rejected and Section 502(g)(1) has been applied.

> [T]he court ... shall allow such claim ..., except to the extent that—
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds-
> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
> (i) the date of the filing of the petition; and

> (ii) the dale on which such lessor repossessed, or the lessee surrendered, the leased property; plus
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;
> 11 U.S.C. § 502(b)(6).

The legislative history explains that this subsection "is designed to compensate the landlord for his loss while not permitting a claim so large (based upon a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate." H.R.Rep. No. 95–595, at 353 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6309; S.Rep. No. 95–989, at 63 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5849.

under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

Many courts have combined the authority of the trustee to reject an unexpired lease under Section 365 with the relation-back concept embodied in Section 502(g)(1) to conclude that all but the portion of the postpetition rent attributable to the estate's actual use of the leased property is to be treated as a prepetition claim. For example, in *Braniff Airways*, the Fifth Circuit said:

> The claim for administrative rent is generally made after the lease has been rejected, *see, e.g., Standard Furniture, supra*, 3 B.R. at 529, for that is when the actual benefit of the demised premises to the debtor lessee is most easily determined. This is logical, for if there is no benefit to the estate, the breach of an executory agreement or lease does not give rise to a claim for administrative expense, but only an unsecured breach of contract claim under section 502(g). *In re Airlift International, Inc.*, 761 F.2d 1503, 1509 (11th Cir.1985). *See also American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 124–25 (2d Cir.1960).

783 F.2d at 1286.

And the court in *JAS Enterprises* then offered this expanded explanation:

[R]ejection gives rise to a claim for breach of contract. 11 U.S.C. § 365(g) (1994). Conceptually, this claim for breach of contract results in a claim for damages respecting three separate intervals of time: 1) the time prior to the filing of the bankruptcy case; 2) the period between the bankruptcy filing and sixty days post-petition; and 3) the period of time beyond sixty days after the filing of the bankruptcy. When a lease is rejected, the entire breach of contract claim is treated as if it occurred immediately prior to the filing of the bankruptcy case. 11 U.S.C. § 502(g) (1994). The breach of contract claim for damages for all three intervals of time would, therefore, be deemed a pre-petition claim.

180 B.R. at 215.

But is this what the Bankruptcy Code actually provides? The answer, in this court's opinion, is no. However, as Professor Andrew points out, bankruptcy's treatment of executory contracts and unexpired leases, with its core concepts of assumption and rejection, are relics of the past; as such, "its history remains an indispensable guide." [55] Therefore, it is appropriate to consider again this history before examining in detail what the Bankruptcy Code now states.

### (i) *Pre–Code Law* [56]

Most assets are simply an accumulation of rights and, as such, the trustee's administration of the same poses minimal risk to the estate. Executory contracts and unexpired leases, though, are different because they involve both rights and obligations. On the one hand, the rights associated with a contract or lease can be of considerable value. On the other hand, the related

---

**55.** *Understanding "Rejection,"* 59 U. Colo. L.Rev. at 866.

**56.** Again, this court is indebted to Professor Andrew's considerable effort in *Understanding*

*Rejection* to explain the evolution of bankruptcy jurisprudence with respect to executory contracts and unexpired leases.

liability of that same contract or lease could place the estate at substantial risk should the estate itself later default. Therefore, courts have long straggled with how to give the trustee the opportunity to assess the benefits and liabilities of a particular executory contract or unexpired lease before actually exposing the estate to its inherent risks.

The assumption/rejection dichotomy is a reflection of this struggle. As already discussed, the pre-Code solution for dealing with "burdened" assets like a leasehold interest was to adopt the fiction, first recognized in *Copeland,* that the leasehold did not become property of the estate until the trustee actually decided that it was in the estate's interest to become a party to both the rights and obligations associated with the underlying lease. In many ways, then, the estate's subsequent "assumption" of a beneficial leasehold was like a postpetition assignment of that interest to the estate at the trustee's election. And from this naturally followed the corresponding notion that the trustee's decision not to assume a leasehold resulted in its "rejection." But rejection within this theoretical construct did not involve the same formality as did assumption, for a lease's so-called rejection meant only that the status quo was being maintained—i.e., that the debtor continued to keep that interest. Indeed, a trustee's rejection of a lease under the former Act might have been nothing more than the informal recognition by all concerned that the lease was forever to remain outside of the estate.

However, acceptance of the *Copeland* fiction raised many other issues, with perhaps the most interesting being whether the landlord of an ultimately "rejected" lease even had a claim against the estate for the future rents that were still due. In its simplest form, the conceptual problem was this: If the debtor was not actually in breach of the contract at the commencement of the case, which is the point in time when claims against the estate are to be determined, how, then, could the contracting party be said to have a valid claim when the resulting breach was the consequence of the trustee's postpetition decision not to assume the same? Indeed, the problem of awarding prepetition damages to the landlord on a lease that ultimately was not assumed by the estate was further complicated by the fact that nonbankruptcy law typically would not recognize the failure to pay a single installment of rent as entitling the landlord to damages for all future rents.[57]

Ever resourceful, the pre-Code courts answered the challenge by adopting yet another fiction—that the filing of the case itself was an anticipatory breach that then justified the nonparty's claim against the estate for any resulting damages in the event the contract or lease was not finally assumed. *See, e.g., Central Trust Co. of Illinois v. Chicago Auditorium Ass'n,* 240 U.S. 581, 592, 36 S.Ct. 412, 415, 60 L.Ed. 811 (1916) ("We conclude that proceedings, whether voluntary or involuntary, resulting in an adjudication of bankruptcy, are the equivalent of an anticipatory breach of an executory agreement within the doctrine of *Roehm v. Horst,* supra.").[58] Moreover, the fictional breach recognized in *Chicago Auditorium* had the further salutary effect of assuring the debtor that the contractor's or landlord's claim for these future damages would in fact be treated as

---

**57.** *Understanding "Rejection,"* 59 U. Colo. L.Rev. at 868.

**58.** *Chicago Auditorium* was limited to executory contracts. However, the Supreme Court later extended the same anticipatory breach

concept, with some modifications, to also permit claims by landlords for future rents under an unexpired lease. *Irving Trust Co. v. A.W. Perry, Inc.,* 293 U.S. 307, 311, 55 S.Ct. 150, 151, 79 L.Ed. 379 (1934).

a prepetition claim and, as such, subject to his discharge.

Therefore, as Professor Andrew observed, the courts had developed a largely complete executory contracts doctrine by the time the first statutes dealing with that topic appeared in the 1930s.

The first component was the *Copeland* rule, which excluded 'executory' contract and lease assets from the bankruptcy estate-notwithstanding broad statutory language vesting all assets in the trustee-absent an election by the trustee to accept them. That rule protected the estate from unadvisedly incurring administrative liabilities, and correspondingly assured that parties to pending contracts and leases would not be elevated fortuitously to administrative priority. 'Rejection' (or 'repudiation' or 'renunciation,' among other terms) simply described the estate's decision not to succeed to such an asset. What was rejected was the transfer of the asset to the estate.

The second component was the rule that the estate could affirmatively elect to succeed to ('assume' or 'accept' or 'adopt') the debtor's rights in a contract or lease, at the cost of obligating the estate on the debtor's liability as an administrative expense. That rule allowed the estate to realize on the value of a contract or lease asset in circumstances where it seemed desirable to do so.

The third component was the *Chicago Auditorium* rule that, absent assumption, an executory contract would be viewed as having been 'breached' as of the instant of bankruptcy. That rule resolved uncertainty over whether the debtor would continue performance on a contract, and thereby permitted a claim by the non-debtor party. Thus, the rule served to counterbalance the first component of the doctrine: The non-debtor party to a contract that happened to be pending when a bankruptcy was commenced would not be elevated over other creditors, but neither would it be demoted below them to the status of non-creditor. Correspondingly, the rule enhanced the debtor's discharge by including within its scope the debtor's contractual obligation.

*Understanding "Rejection,"* 59 U. Colo. L.Rev. at 881–82.

These components, in turn, formed the theoretical underpinnings of actual amendments then made to the Bankruptcy Act itself. For example, the *Copeland* rule became former Section 70b [59] and *Chicago Auditorium* inspired [60] former Section 63c.[61] Not surprisingly, former Section 63 is the Act section that addressed the allow-

---

**59.** The trustee shall assume or reject an executory contract, including an unexpired lease of real property, within sixty days after the adjudication ... but the court may for cause shown extend or reduce the time.

11 U.S.C. § 110(b) (repealed).

*See also, Smith v. Hoboken R.R., Warehouse & S.S. Connecting Co.,* 328 U.S. 123, 128, 66 S.Ct. 947, 951, 90 L.Ed. 1123; *In re Gravure Paper & Board Corp.,* 234 F.2d 928, 930 (3rd Cir.1956).

**60.** This court chooses "inspired" because there has since been a considerable debate among academics as to whether Congress adopted or rejected *Chicago Auditorium* in connection with its own enactments. Com-

pare, *e.g.,* Vern Countryman, *The Use of State Law in Bankruptcy Cases (Part 1),* 47 N.Y.U. L.Rev. 407, 413–20 (1972) and Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U. Colo. L.Rev. 845, 866–76 (1988). That debate, though, need not be resolved in this opinion. It is enough here that Section 502(g)(1) and its predecessor, former Section 63c, respond to *Chicago Auditorium* one way or the other.

**61.** Notwithstanding any State law to the contrary, the rejection of an executory contract or unexpired lease, as provided in this Act, shall constitute a breach of such contract or lease as of the date of the filing of the petition initiating a proceeding under this Act.

ance of claims and former Section 70 is the Act section that identified what would become the estate's property.

### (ii) *Comparative Analysis*

This, then, was the state of executory contract law immediately before the replacement of the former Act in 1978 with the Bankruptcy Code. However, as science's recent acceptance of plate tectonics has taught,[62] long-cherished rules and doctrines cannot withstand a fundamental change in underlying theory. Therefore, should not the Code's rejection of *Copeland* have had a substantial effect upon bankruptcy's treatment of executory contracts and unexpired leases, for again, much of what had been formulated under the former Act to address these issues had been premised upon the fiction adopted in that particular case?

Therefore, it is worth stepping back in time, to 1977, and postulating what would be some of the expected outcomes in anticipation of this change. This court suggests the following:

• If the estate, with the elimination of *Copeland,* is to become a party to all of the debtor's leases from the very outset of the case, then the estate should also immediately become subject to the liabilities associated with the same. *Cf. Palmer,* 104

F.2d at 163 ("[I]Insolvency ought not to give the lessee's creditors greater rights to possession than the lessee himself enjoyed; and if the trustee were to hold the premises even temporarily, he should be allowed to do so only upon the same terms as the lessee."). The trustee, though, should still be able to defer actually paying any postpetition rent due so long as the automatic stay prevents the lessor from acting upon the estate's default to recover its property.

• However, recognizing the estate as immediately becoming the assignee of the debtor's leasehold interests should also render as unnecessary the practice under *United Cigar* and other similar pre-Code cases of relying upon equitable doctrines to justify awarding the landlord at least something as administrative rent for the estate's use of the premises. Indeed, what has been lost in modern analysis is that the very same pre-Code courts that were denying actual rent because none was legally due under the *Copeland* fiction were nonetheless more than willing to award administrative rent on the theory that an "equitable tenancy" had arisen between the lessor and the bankruptcy estate. *Oscar Heineman Corp. v. Nat Levy & Co., Inc.,* 6 F.2d 970, 975 (2nd Cir.1925) ("It would be the rankest injustice to hold that

---

11 U.S.C. § 103(c) (repealed).

**62.** Plate tectonics—that is, the now widely recognized theory that involves the gradual drift of continents over the Earth's subsurface—was just another crackpot idea not so very long ago. Its only recent acceptance, though, was not due to the lack of prior evidence. To the contrary, even the untrained eye can see that the west coast of Africa and the east coast of South America resemble two pieces to a giant jigsaw puzzle. Scientists had also for many years been finding common fossils in locations that were separated by thousands of miles of ocean.

Yet the geological community itself stubbornly resisted the mounting evidence. Geologists would explain away, for example, common finds in Florida and France by simply connecting the two distant points with an ancient land bridge. That there was no evidence to substantiate that bridge or the myriad other bridges that soon blackened the prehistoric maps was of no consequence.

Indeed, even as late as the 1950s, Charles Hapgood, an eminent academician, dismissed plate tectonics as an amusing distraction with none other than Albert Einstein contributing an approving foreward. And were it not for the persistence of a German meteorologist and a few other dissidents, it is likely that plate tectonics would still be regarded today as only fanciful thought.

Adapted from Bill Bryson's *A Short History of Nearly Everything*, pp. 173–77 (Broadway Books 2003).

the receiver could enjoy the benefit of a lease for a period, and then, by rejecting it, escape any liability to the lessor for the benefits which had accrued thereunder"). *See also, United Cigar,* 69 F.2d at 515; *Cent. Manhattan Properties,* 91 F.2d at 730. Therefore, it would certainly seem to follow that these same pre-Code courts that are so often cited in modern cases as limiting actual rent to some lesser amount would have actually awarded, without hesitation, the full amount due under the lease as administrative rent had *Copeland* only been rejected earlier. *Cf. Palmer,* 104 F.2d at 163.[63]

• As for the concepts of assumption and rejection, their relative importance should be reversed with *Copeland's* elimination. In other words, under the Bankruptcy Act, the estate's assumption of a lease was the more significant event, since assuming the same under the *Copeland* fiction literally meant that the lease had only then become the estate's property and, correspondingly, the estate's obligation. On the other hand, the trustee's so-called rejection of a lease under the former Act simply meant that the trustee had elected to leave matters be.

---

**63.** If, as this court concludes, the estate must pay whatever postpetition rent accrues in order to preserve the estate's leasehold interest, it is fair to ask why the same administrative priority should not be afforded to whatever unpaid rent had accrued prepetition. However, while there is certainly some logic to the question, other bankruptcy concepts are also at work. Specifically, the entire bankruptcy process is based upon a division in lime, with claims that arose prepetition against the debtor being treated in one manner and claims that arose against the estate postpetition being treated in a different manner. Therefore, to ignore prepetition arrearages in the rent due when considering the postpetition relationship between the lessor and the estate is not inconsistent.

It is also fair to ask why the estate shouldn't also be charged for administrative rent for the period after the lease is rejected but before the subject property has been recovered. For example, should not the estate in this instance have to continue paying rent for the shredder that remains to this very day on the same spot it has always been? Or perhaps, more to the point, shouldn't a trustee or debtor-in-possession have to continue paying rent on, say, a leased truck even though the lease has been rejected if the truck nonetheless is used thereafter for the estate's benefit?

The answer is no. *Macomb Occupational Health Care,* 300 B.R. at 288–91. Put simply, rejection of a lease under Section 365(a) means not only that the estate will no longer be bound by the terms of the lease to which the estate had become an assignee but also that there no longer remains any impediment

for the landlord to evict the estate from the leased premises or for the lessor to recover the leased equipment.

> By rejecting an unexpired lease, the bankruptcy trustee is unequivocally communicating to the landlord that the bankruptcy estate no longer intends to perform the debtor's obligations under the existing lease agreement.

*Id. See also, Palace Quality,* 283 B.R. at 889–90 ("... [R]ejection of the unexpired lease is an unequivocal manifestation of the estate's decision that it is no longer in the estate's interest to preserve the exclusive right to possess and use the property which is subject to the leasehold interest").

In effect then, the estate, upon its rejection of a lease, becomes a holdover, with whatever rights the landlord or lessor had to recover future rents under the existing lease being reduced to a prepetition claim for damages under Sections 502(b)(6) and (g)(1). But, under applicable nonbankruptcy law, holdovers owe nothing for the continued use of another's property. The owner's choice is either to establish a new tenancy with the holdover and then collect rents based upon that new tenancy or to remove the holdover as a trespasser who has no right to remain in possession of what clearly now must be returned to the landlord or lessor. In other words, a landlord or lessor only "suffers" the estate's continued possession of the subject property after its rejection of the underlying lease, and as such, the landlord or tenant has but itself to blame for not recovering its property sooner.

However, eliminating *Copeland* would by necessity elevate rejection from simply being a reflection of the status quo to a formal step that must be taken by the trustee in order to rid the estate of a lease whose rights and, more importantly, whose liabilities had previously become the estate's at the outset of the case. Conversely, assuming the same lease would be relegated from being part of the estate's very creation, as it had been, to the much more modest role of merely signifying the estate's decision to continue with the already acquired lease as a more permanent party.

• Assumption of a lease under the former Act included the additional fiction of the assumed lease relating back to the commencement of the case so as to then obligate the estate for the actual postpetition rents accrued. *See, e.g., Frazin,* 183 F. at 32; *United Cigar,* 69 F.2d at 515. However, that fiction should no longer be necessary in a *post-Copeland* world in which the estate was a party to the lease all along. Nonetheless, a rule would still be needed to permit the trustee the opportunity to cure whatever unpaid rents had been accruing postpetition as a consequence of either the lessor's neglect or the automatic stay's continued protection.

• If, though, the trustee were to instead decide post-*Copeland* to take the formal step of renouncing the lease and the attendant obligations that had become the estate's burden from the outset of the case, the estate would still have to account to the lessor for the remaining rent due under the lease. That is, while the elimination of *Copeland's* fiction would result in all postpetition/pre-rejection rents having already become the estate's own administrative obligation, addressing the lessor's separate claim for future unpaid rents would continue to be an issue.

### (iii) *The Bankruptcy Code*

How, then, do the above postulations fare against what the Bankruptcy Code actually says? First, the new rules incorporated into Section 365 do appear to follow what theory suggests. Take, for example, an unexpired lease that becomes the estate's property at the outset of the case and is then later assumed by the trustee. Again, post-*Copeland* theory mandates that while the estate may be able to defer paying the rent that has accrued during the administrative period (i.e., the interval between the filing date and the lease's ultimate assumption), the estate must still account for that rent in connection with the lease's assumption and, consistent with that theory, Section 365(b)(1) now requires, among other things, that the trustee cure all postpetition arrearages in rent as part of the assumption process. Indeed, consistent with this same theory, subsequent amendments to Section 365—to wit, subsections (d)(3) and (d)(5)—prevent estates holding leased commercial property from even deferring payment of the postpetition rents that continue to accrue. Rather, these subsections now put those estates at risk of actually losing possession if payment is even delayed.

Second, it is certainly fair to infer from the absence in Section 541 (former Section 70's modern counterpart) of anything that even remotely resembles former Section 70b, together with the separate creation of an entirely new Section 365, that the Bankruptcy Code's approach to executory contracts and unexpired leases is no longer to be based upon the *Copeland* fiction. To the contrary, the placement of Section 365 within the Code's subchapter concerning case administration suggests that such contracts and leases are in fact to be treated as part of the estate's property from the very commencement of the case and that Section 365's purpose is to set forth the special rules now needed to administer the estate's peculiar interest in property *cum onere,* much as Section 363's purpose

is to provide the overall rules needed to govern the sale of the estate's property generally.[64]

Third, it seems equally clear that the Code's approach to *Chicago Auditorium* has not been as drastic as its approach to *Copeland,* for while Section 541 no longer includes a counterpart to the former Act's embodiment of the *Copeland* fiction, Section 502, which again, is the code section that now addresses the treatment of pre-petition claims, does in fact include in subsection (g) language similar to what had appeared in former Section 63. However, "similar" is the operative word, for it is important to compare closely what had been the language in former Section 63c and what is now the language in Section 502(g)(1).

This is what former Section 63c said:

Notwithstanding any State law to the contrary, the rejection of an executory contract or unexpired lease, as provided in this Act, shall constitute a breach of such contract or lease as of the date of the filing of the petition initiating a proceeding under this Act.

But Section 502(g)(1) is different:

**A claim arising from the rejection,** under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under section (d) or (e) of this section, the same as if such claim had

arisen before the date of the filing of the petition.

(emphasis added).

In fact, what had been former Section 63c now appears instead almost verbatim as (g)(1) of Section 365.

Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition.

11 U.S.C. § 365(g)(1).

The Committee insists in its brief that "[n]owhere in the *Palace* opinion, the statutory text, or the legislative history is there any basis for the conclusion that a 'rejection' claim is somehow limited only to damages arising after the date of rejection." Committee Brief, pp. 15–16. But, as just shown, Section 502(g)(1) as now enacted speaks of only "a claim arising from the rejection under Section 365." And, as also just established, post-*Copeland* theory demands that the estate's rejection of a contract or lease now be a discrete, postpetition event. Indeed, the event now contemplated cannot even occur without the court first giving its approval. 11 U.S.C. § 365(a). Therefore, it is the actual language that Congress chose when it replaced former Section 63c with new Section 502(g)(1) that supports this court's conclusion that the claim now covered by Section 502(g)(1) is limited to only that

---

**64.** And, as already discussed, the legislative history actually states that leasehold interests are now to be within the broad reach of Section 541(a)(1). H.R.Rep. No. 95–595, at 367 (1978); S.Rep. No. 95–989, at 82 (1978). It is particularly noteworthy that both reports refer to new Section 541 as including "the forms of property currently specified in Sec-

tion 70a of the Bankruptcy Act" (which, because of *Copeland,* would not have included executory contracts and unexpired leases) before then stating that Section 541 is to also include " 'title' to properly, which is an interest, just as are a possessory interest, or a leasehold interest, for example." *Id.*

which remains to be paid under the lease's term if and when it is ultimately rejected. However, if more is needed than the plain meaning of the subsection itself,[65] then this court also points to the legislative history and its explanation that Section 502(g)(1) "gives entities **injured by** the rejection of an executory contract or unexpired lease ... a prepetition claim for any **resulting damages....**"[66]

The Committee would certainly like to counter by equating "rejection" as used in Section 502(g)(1) with "breach" as used in Section 365(g)(1) in order to argue that "claim arising from rejection" really means "claim arising from the breach." Of course, that argument begs the obvious question of why Congress did not leave Section 502(g)(1) to read as it previously had under former Section 63c if, in fact, that is what Congress had intended. But, in any event, Section 365(g)(1) does not provide the equivalency that the Committee's argument requires, for that section plainly states only that "rejection ... **constitutes** a breach of such contract or lease" (emphasis added), and "constitutes" in this context means only "establishes."[67] In other words, while a breach may be a consequence of the affirmative act now required of the trustee to reject a lease, that breach, by definition, cannot be the affirmative act itself.

And finally, consider more generally the theory that underpins the Code's treat-ment of executory contracts and unexpired leases now that *Copeland* has been abandoned. The Committee would have the lessor's entire postpetition claim for rent— i.e., both rent actually due for the administrative period preceding rejection and rent not yet due for the period after rejection— allowed as a prepetition claim and then create an entirely new claim for administrative rent based upon the estate's actual use of the subject property during the same administrative period. Such an approach is contrived to say the least. But more important, what is the theoretical justification for this position? Remember, the case law that supports the outcome the Committee advocates is not based upon the notion that the lessor's administrative rent should be restricted. Rather, it is based upon the landlord not having any administrative claim at all unless equity intervened. *United Cigar*, 69 F.2d at 515. In other words, *Copeland's* construct of the lease remaining outside of the estate until finally assumed compelled the conclusion that the estate could not be liable for the rent promised on a lease to which the estate was not a party. On the other hand, it was clearly unfair to let the estate remain in possession of the leased property without any recompense. *Oscar Heineman Corp.*, 6 F.2d at 974 ("A court of equity will not allow a receiver who has had the benefit of the lease to enjoy those

---

**65.** *See, e.g., Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' ") (citations omitted); *White v. Kentuckiana Livestock Market, Inc.,* 397 F.3d 420, 426 (6th Cir.2005) ("Generally speaking, of course, '[t]he plain meaning of legislation should be conclusive, except in the rare instances in which the literal application

of a statute will produce a result demonstratively at odds with the intentions of its drafters.' ") (quoting from *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)).

**66.** H.R.Rep. No. 95–595, at 354 (1978), *as reprinted in* 1978 U.S.CC.A.N. 5963, 6310; S.Rep. No. 95–989, at 65 (1978), *as reprinted in* 1978 U.S.C.CA.N. 5787, 5851.

**67.** Webster's Third New International Dictionary (1986).

benefits without paying therefore—either on the basis of quantum meruit or the terms of the lease according to the circumstances of the particular case."). Consequently, pre-Code courts like *United Cigar* and *Oscar Heineman Corp.* awarded the lessor a reasonable rent to remedy the inequity.

However, the Bankruptcy Code's elimination of the *Copeland* fiction also eliminates any further need for this equitable relief, for the estate now is clearly a party to the lease and its attendant obligations from the very commencement of the case. What is missing, though, is any new Code

provision to whittle down the actual rent that the estate, as the debtor's successor, is now obligated to pay under the lease to something less, or even nothing at all, as the Committee advocates.[68]

■ Indeed, the allowance of the actual rent incurred as a necessary administrative cost of preserving the estate under Section 503(b)(1)(A) becomes ever so more apparent with the Bankruptcy Code's rejection of the *Copeland* fiction, whereas the rationale for previously awarding only a portion as an administrative expense— i.e., the pre-Code courts' need under *Copeland* to award at least something to the

**68.** This court recognizes that a few courts have at least suggested that limiting administrative rent to only a reasonable amount is justified on economics alone—i.e., that such reductions ensure a larger distribution to the estate's claimants. For example, in *Burlington N. R.R. Co. v. Dant & Russell, Inc. (Dant & Russell, Inc.)*, the Ninth Circuit said not only that a lessor's administrative claim cannot exceed what would constitute a fair and reasonable rental value, but that the bankruptcy court had the broad discretion to award even less under appropriate circumstances. 853 F.2d at 700, 706–07 (9th Cir. 1988) ("[K]eeping costs to a minimum serves the overwhelming concern of the Code: Preservation of the estate. This limitation is necessary to protect the limited assets of the estate for the benefit of the unsecured creditors' interests and is particularly important in a Chapter 11 case where a partial liquidation is necessary to facilitate reorganization"). *Id.* at 706.

Other courts, though, have recognized that the bankruptcy courts are far more constrained in their authority to refuse payment to administrative creditors when nonbankruptcy law would otherwise require payment in full. Again, as Judge Brody declared in *Fred Sanders Co.:*

The view that the estate should be liable only for the debtor's actual use or occupancy is based, in part at least, upon the premise that expenses of administration are to be minimized. The desire to keep a lid on expenses of administration is laudable, but an estate is not to be maintained for the debtor or creditors at the expense of those

who have valid charges against property of the estate.

22 B.R. at 906.

*See also, Diversified Servs., Inc. v. Harralson,* 369 F.2d 93, 95 (5th Cir.1966); *Dayton Hydraulic Co. v. Felsenthall,* 116 F. 961, 966 (6th Cir.1902); *In re Curry Printers, Inc.,* 135 B.R. at 572; *In re Xonics, Inc.,* 65 B.R. at 74. And, indeed, Judge Hand anticipated this sentiment when he could not in *Palmer* conceive of the estate remaining in possession of a leasehold acquired from the debtor by operation of the bankruptcy laws without also having to pay the actual rent upon which that leasehold depended. 104 F.2d at 163 ("While such ad interim payments need not, and of course would not, constitute an adoption of the term, insolvency ought not to give the lessee's creditors greater rights to possession than the lessee himself enjoyed; and if the trustee were to hold the premises even temporarily, he should be allowed to do so only upon the same terms as the lessee.")

Of course, this is not to say that the bankruptcy court is powerless in all instances to adjust administrative claims based upon what is reasonable under the circumstances. For example, the Bankruptcy Code clearly directs the court to do so when assessing the compensation to be awarded the estate's professionals. *Cf.* 11 U.S.C. § 330(a). However, the very fact that Congress has specifically directed the courts to consider reasonableness in that instance underscores the absence of similar Congressional authority to equitably adjust postpetition rent that continued to accrue on a lease that the estate could have rejected earlier but did not.

lessor as a matter of equity—is even less apparent.[69]

### (c) *Section 363(b)*

■ Although not raised by the Committee, this court would note that Section 363(b) is yet another section that might be relied upon for the estate to remain in possession of leased property without having to pay the corresponding rent due. That section, of course, provides that a trustee may, after notice and a hearing, "use property of the estate." Why, then, cannot the trustee simply use the leased property, whether it is land or a piece of equipment, in exchange for some reasonable amount as the lessor's adequate protection? Or more to the point, why should the estate have to pay anything if the estate chooses not to use the subject property?

The answer lies in the distinction between what constitutes "property of the estate," which, under Section 541(a)(1), is only the debtor's legal or equitable interest in the property, and the property itself. As such, all that the trustee can seek authority to use under Section 363(b) in the case of leased property is the debtor's rights to possession arising under the terms of the lease. However, those rights are burdened by the corresponding obligation to pay the rent agreed upon under the very same agreement, which inevitably leads again to Judge Hand's point in *Palmer*—that the estate should not be able for a moment to remain in possession of leased property unless the estate is also obligated to honor the obligations upon which that possession is conditioned. 104 F.2d at 163. For example, the estate might seek authority under Section 363(b) to use leased premises in a way that is outside the ordinary course. However, whatever authority was acquired would be necessarily circumscribed by the further reality that the intended use could be pursued only if the estate continued to pay the rent due on the underlying lease.[70]

**69.** There is, though, one loose end-Section 365(g). As already noted, this subsection's counterpart under the former Act was Section 63c and, in fact, the two subsections are virtually identical. But Section 502(g)(1), with its very different language, has replaced former Section 63c. Why, then, did Congress replicate former Section 63c as new Code Section 365(g)(1)?

The legislative history says that Section 365(g)(1)'s purpose "is to treat rejection claims as prepetition claims." H.R.Rep. No. 95–595, at 349 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6305; S.Rep. No. 95–989, at 60(1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5846. Fair enough. However, it would appear that Section 365(g)(1) protects the non-debtor party as well. Consider, for example, a debtor who doesn't want to assume a requirements contract with a supplier but who nonetheless wants to continue the relationship for a while before it is rejected. Although the supplier's refusal to perform under those circumstances might be justified based upon anticipatory breach, the supplier nonetheless would be at risk of being sued by the estate for damages should it refuse and a court were later to conclude that there had been no such breach. Section 365(g)(1), though, makes it absolutely clear that the supplier is not to be put at such risk by unequivocally establishing that the estate's ultimate decision to reject will in fact be treated as a breach by the estate so as to excuse the supplier from what might otherwise be claimed as a postpetition breach of its own.

**70.** Sections 361(3) and 363(e) also have a bearing upon a lessor's ability to overcome the automatic stay so as to recover property on a nonperforming lease. The latter makes clear through a 1994 amendment that commercial equipment lessors are entitled to adequate protection in the event the trustee or debtor-in-possession continues to use the leased property and the former provides that an administrative expense claim may not be included in the adequate protection offered. Both of these sections certainly benefit the commercial equipment lessor as an alternative triggering event during the first sixty days of the bankruptcy case since an equipment lessor, unlike a commercial landlord, cannot

(d) *Section 503(b)(1)(A) and the Piggly–Wiggly Alternative*

 Ironically, Section 503(b)(1)(A) itself offers what may be the best argument against allowing Fifth Third's claim for administrative rent, albeit the Committee has raised this argument only obliquely. As already discussed, Judge Hand preferred treating the trustee who continued in possession of leased properly as at best a non-paying tenant by sufferance who would be saved from eviction only so long as the automatic stay would protect him. *Piggly–Wiggly*, 296 F. at 945. Of course, such a view is not warranted under the Code given its recognition that the estate immediately succeeds to the debtor's own possessory rights to the leased property upon the commencement of the case. Nonetheless, an argument can certainly be made along the same lines as in *Piggly–Wiggly* that nothing should be paid as an administrative rent for as long as the automatic stay remains in place since the stay, by its very nature, eliminates the need to pay rent in order to remain in possession.

Perhaps this is the better solution. After all, as the Committee points out, Fifth Third showed no interest during the postpetition interval prior to the lease's rejection in lifting the automatic stay and regaining possession of the shredder. Why, then, should the estate now have to pay rent to Fifth Third for property whose possession the estate has already enjoyed at no cost through the protection afforded by Section 362(a)(3)?

However, as appealing as this argument may be, it runs counter to how the administrative rent issue has been addressed by the courts both under the former Act and the current Code. Congress most certainly compelled a change in the rules when it eliminated the *Copeland* fiction in 1978. But with this said, there is no indication that Congress also intended to reject altogether the long recognized concept that some entity—whether it be the debtor under the former Act or the estate under the Code—must account to the lessor for the actual rent that continues to accrue on a lease postpetition. In other words, while the Bankruptcy Code's rejection of *Copeland* certainly requires a different outcome than what had been the case under the former Act, what has not changed is the courts' ever constant acknowledgment that the underlying lease requires at all times that mere be some tenant who is accountable to the lessor for the agreed upon rent.

It is one thing, then, to re-alter, as this court is doing in this instance, the outcomes required under this well-established approach so as to reflect Congress' decision under the Code to change the point in time as to when the bankruptcy estate is to replace the debtor as the tenant responsible for those rents. However, it is a very different matter for the court to abandon this construct altogether and in effect provide Fifth Third with nothing for these two months when there is no question that the estate was in fact the tenant during this interval given the Code's rejection of *Copeland*, Again, Judge Hand's observation in *Palmer* is instructive:

> [I]t would be a little hard to see by what power the court could keep a trustee in possession while he was determining his

demand the actual payment of the rent during this time frame. In other words, recovering depreciation during the first sixty days may not be the same as receiving the actual rent due, but it is better than simply the promise of an administrative claim, or perhaps even nothing. But, as already discussed, what is or is not available as a triggering device for

the landlord or lessor to recover its property is an entirely different issue from the more basic one of deciding whether the estate, as the effective assignee of the debtor's lease, should be compelled to ultimately pay as an administrative expense the actual rent upon which the continued possession of the subject properly was expressly conditioned.

course, without compelling him meanwhile to fulfill the conditions imposed upon the term; for instance, the payment of any rent, secured by a right of reentry.

104 F.2d at 163.

The Committee itself points out that the courts are not to erode past bankruptcy practices absent a clear indication in the Bankruptcy Code that Congress intended such a departure. *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 563, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990). *See also, Midlantic Nat. Bank v. New Jersey Dept. of Envtl. Prot.*, 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."); *Dewsnup v. Timm*, 502 U.S. 410, 419, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992). This court is well satisfied that the Bankruptcy Code's elimination of the *Copeland* fiction warrants the conclusion it has reached in this opinion—i.e., that the bankruptcy estate, being now the recognized successor to the debtor's leasehold rights immediately upon the commencement of the case, must also now pay under Section 503(b)(1)(A) the agreed upon rent due the lessor as an actual and necessary expense of preserving the estate's rights under the lease. Therefore, this court has no compunction in departing from what had been prior practice under the former Act to now award Fifth Third an administrative rent claim on this basis.

This court, though, has not discerned a similar justification for ignoring altogether the lessor/lessee relationship, which is exactly what it would have to do if Fifth Third is to be denied any administrative claim for rent unless and until the automatic stay is lifted. Therefore, it is for Congress, not the courts, to determine whether landlords and lessors are now to be denied administrative rent on what is an entirely different basis from that which had been articulated by the courts in the past and which in fact would be inconsistent with how the Bankruptcy Code requires that same theory to now be applied.[71]

### B. *Is Fifth Third Entitled To Receive As An Additional Administrative Claim The Pro Rata Share Of The Unbilled Personal Property Taxes Associated With The Shredder For That Year?*

The shredder is located in Elkhart County, Indiana and, therefore, it is subject to taxation by that authority. Fifth Third represents that the taxes due for this period have not yet been billed.[72]

---

**71.** Denying administrative rent altogether so long as the stay remains in place also conflicts with other provisions of the Bankruptcy Code. For example, Section 502(g)(1) limits the landlord's claim to only damages for unpaid rents that would have come due after the trustee had secured the court's approval and then actually rejected the lease. Therefore, the landlord would be left receiving no rent whatsoever for the gap between the case's commencement and the lease's rejection if the automatic stay is treated as permitting the estate to pay no administrative rent during this interval. This clearly would not have been the result under the former Act, for the landlord's pre-rejection claim would have also been included in the lessor's pre–petition claim under what was then former Section 63c and the lessor would also have been able to assert its separate equitable claim for rent against the estate itself. Consequently, it is unlikely that Congress would have intended even worse treatment of lessors under the Bankruptcy Code than they were already receiving under the former Act without Congress also giving at least some indication that that was its intention.

**72.** Fifth Third's representations appear to be inconsistent with the Indiana statutes concerning the assessment and payment of personal property taxes. Those statutes provide that the appropriate taxing authority is to assess the subject property on March 1 of

Nonetheless, it contends that it is entitled to recover from the estate a proration of what it expects will be the tax bill once it is received.[73] Fifth Third calculates the proration to be $40,312.56.

Ironically, the Committee's contention that the estate is also not obligated for this pro rata share undercuts its own position with respect to the payment of administrative rent. Consider *In re Koenig Sporting Goods, Inc. v. Morse Road Co. (In re Koenig Sporting Goods, Inc.)*, 203 F.3d 986 (6th Cir.2000), which the Committee cites with approval. In *Koenig*, the panel held that the estate was obligated to pay as an administrative expense the full month of rent due in advance even though the lease was then rejected the very next day because that is what the terms of the lease required. *Id.* at 989. Granted, the Sixth Circuit relied upon Section 365(d)(3), as opposed to the more elegant rationale Judge Hand provided in *Palmer*, but the point is still the same—that the outcome regarding such issues is to be dictated by the terms of the lease as opposed to by the court and its own notions of equity.

In this instance, it is uncontested that the personal property tax in question was not even billed at the lime Debtor, as debtor-in-possession, finally did reject the shredder lease in June of 2008. Conse-

quently, if *Burner* and *Graham Square* require that the April and May amounts due under the lease be treated as administrative rent only because the estate's continued possession under the same lease was conditioned upon their payment, it follows that the estate could continue to enjoy possession without having to incur any administrative expense for associated personal property taxes until the county finally billed Fifth Third for those taxes and Fifth Third then sought reimbursement under the lease for the same. Indeed, it appears under the existing lease agreement with Debtor that Fifth Third could have compelled the estate, as successor lessee, to supplement the monthly base rent due with an additional monthly amount for taxes "scheduled to become due,"[74] and had Fifth Third in fact done so, it would be on much firmer ground today. In other words, had Filth Third actually demanded from the estate in April and May a pro rata share of the expected tax bill as was its option under the lease, the estate would have been just as obligated to pay pro rata taxes charged as a condition for continued possession as it was to pay the base rent upon which continued possession also depended. But Fifth Third did not, and as a consequence, Fifth Third is left with having to recover the debtor's share of the yet to be billed

---

each year and that the taxpayer is to then file a return by May 15 of the same year. 50 Ind. Admin. CODE 4.2–1–1(d) and (e) (2003). However, the ensuing tax is not paid until the following year, with one equal installment being due on May 10 and the other being due on November 10. 50 Ind. Admin. CODE 4.2–1–1(p) (2003). Nonetheless, this court will, for purposes of this opinion, accept Fifth Third's representations as accurate and therefore proceed with its analysis on that basis.

**73.** The lease provides that Fifth Third was to otherwise pay the personal property taxes due Elkhart County as soon as it received the tax bill and that Debtor would then reimburse Fifth Third for the same, together with a fee,

upon Fifth Third's demand. ¶ 18, Master Lease Agreement, attached as Ex. A to Fifth Third/SEET Connecticut's August 22, 2008 Motion. Therefore, this court also presumes, for purposes of this opinion only, that that was the procedure to be followed by Fifth Third at all times, including the postpetition period prior to the lease's rejection.

**74.** *See*, ¶ 4 to Equipment Schedule—No. 001 Dated March 31, 2006 to Master Equipment Lease Agreement dated as of September 21, 2005, and ¶ 4 to Equipment Schedule—No. 002 dated effective June 20, 2006 to Master Equipment Lease Agreement dated as of September 21, 2005. (Exhibits to Fifth Third/SEET Connecticut's August 22, 2008 Motion).

taxes under the lease as part of its Section 502(g)(1) rejection claim just as it must look to its rejection claim under that subsection to recover the rents that had not yet come due under the lease when the estate's rejection became effective on June 20, 2008.[75]

Fifth Third cites *In re Handy Andy Home Improvement Centers,* 144 F.3d 1125 (7th Cir.1998) as leading authority for its proposition that the yet to be billed taxes on the shredder should nonetheless be prorated as an additional administrative charge for April and May of 2008. However, *Handy Andy* is easily distinguishable since it addressed the question of allocating taxes that straddled the petition for relief.[76]

The question is whether the tenant's debt to the landlord for the taxes is entirely a postpetition debt or must be prorated between the prepetition and postpetition period of the tenant's occupancy.

*Id.* at 1126.

In contrast, the parties in this case appear to agree that the taxes here are entirely a postpetition obligation.[77]

Moreover, the reasoning in *Handy Andy* is questionable. First, the panel unduly focused on Section 365(d)(3) as the pivotal Code section. Granted, that section had relevance vis-a-vis whether the landlord in that instance could have secured relief from the automatic stay and evicted the estate had the tax obligations in question fallen within its provisions.[78]

75. Fifth Third also relies upon the lease's own provision for the proration of taxes upon termination as justifying the proration it advocates. ¶ 18, Master Lease Agreement. However, termination of the lease is not at issue in this instance and, as such, this provision of the lease is irrelevant. Indeed, to the extent the Debtor's ultimate rejection of the lease is tantamount to its termination, the recovery of unpaid taxes at that time would by definition be part of Fifth Third's rejection claim under Section 502(g)(1).

76. As in this case, the *Handy Andy* lease contemplated the landlord paying the tax bill when received and then seeking reimbursement from the debtor/tenant. Accordingly, the landlord paid the 1994 taxes when it received the tax bill in September 1995, and it in turn billed the debtor shortly after the involuntary case had been commenced but before the actual order for relief was entered in November 1995. The landlord then received another tax bill in February 1996 for the 1995 taxes, and after paying that bill, it invoiced the now debtor-in-possession for this amount as well. The lease, though, was not rejected until April 1996.

The landlord maintained that the estate should pay in full both of the invoices it had sent to the debtor postpetition for those taxes. The debtor-in-possession, however, argued that the estate should have to pay only its pro rata share of the 1995 taxes that the landlord had paid in 1996 because the 1994 taxes and

a portion of the 1995 taxes had in fact arisen prepetition.

77. Again, Indiana law bills taxes retrospectively as opposed to prospectively. 50 Ind. Admin. CODE 4.2–1–1(d) and (e) (2003). Moreover, it bills for the prior years' taxes in two installments, one due on May 10 and the other due on November 10. 50 Ind. Admin. CODE 4.2–1–1(p) (2003). Therefore, Fifth Third should have received the May 10 bill for half of the 1995 taxes assessed against the shredder prior to Debtor's June 20, 2008 rejection of the underlying lease. However, Fifth Third offers no explanation as to why it did not pay that bill when received, as required by the lease, and then demand that the estate reimburse it for the same as also required by the lease.

78. Interestingly, the fact that *Handy Andy* had been an involuntary proceeding influenced the panel's decision because Section 365(d)(3) addresses only obligations "arising from and after the order for relief" and one of the tax obligations had been billed to the debtor during the gap of time between the involuntary petition and the entry of the final order. However, that distinction would have made no difference had the panel looked instead at the underlying landlord/tenant relationship since the estate and the attendant transfer of the leasehold interest would have occurred when the petition was filed regardless of

*See, e.g., JAS Enterprises,* 180 B.R. at 218; *Midway Airlines,* 406 F.3d at 235–36. However, what the panel in *Handy Andy* ignored was the underlying fundamentals of the landlord/tenant relationship itself. Again, the neutral transfer rule, which the Seventh Circuit, like the Sixth Circuit, has recognized,[79] treats the bankruptcy estate created upon the commencement of the case as in effect an assignee of an unexpired lease who acquires the possessory rights afforded by that lease but who also assumes the corresponding burdens upon which those rights are conditioned. Therefore, it seems to this court that the first question the panel in *Handy Andy* should have asked was what would be the outcome if there had been an assignment outside of the bankruptcy context and the debtor's assignee had not taken care of the landlord's tax bills when presented, for this court is reasonably satisfied that the panel would have agreed that the assignee would have had to reimburse the landlord for all of the 1994 and 1995 taxes as the lease required (as opposed to only a pro rata share) or risk eviction from the premises.

The *Handy Andy* panel also reached its conclusion largely upon what it perceived as the purpose of Section 503(b)(1)(A)[80]

without first considering what that subsection actually requires—that administrative priority is to be given to "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C § 503(b)(1)(A). Indeed, it is interesting that the *Handy Andy* panel offers this hypothetical in the very same paragraph as an example of what would be a proper administrative expense.

> Were the tax collector knocking on Handy Andy's door, threatening to foreclose, and Handy Andy had to borrow money to pay the tax collector, the debt arising from the loan would come within section 503(b)(1).

*Id.* at 1127.

But in reality, the landlord in *Handy Andy* was the "tax collector" in its example since the landlord too was "knocking on Handy Andy's door" with the threat of evicting Handy Andy from the premises. Consequently, the panel's hypothetical demands this further question—if, as the panel concluded, a loan to the estate to hold off the tax collector or landlord from recovering its property was entitled to Section 503(b)(1) administrative priority, why is not the landlord entitled to the same priority if no loan could be obtained?[81] Or to put it differently, why is the obligation owed to the landlord not

---

whether the petition was voluntary or not. 11 U.S.C. §§ 303 and 541.

**79.** *In re Sanders,* 969 F.2d 591, 593 (7th Cir. 1992) ("The *Lyons* decision is founded on the basic tenet of bankruptcy law that a bankruptcy trustee succeeds only to the title and rights in property that the debtor had at the time she filed the bankruptcy petition. Filing a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds the interest.") (citations omitted).

**80.** This interpretation [*i.e.,* that Section 365(d)(3) required the estate to pay only Us pro-rata share of the taxes of 1995] is more sensible than National's because it tracks the purpose of giving postpetition creditors a high priority in the distribution of the debtor's estate. The purpose is to enable the debtor to

keep going for as long as its current revenues cover its current costs, so that it does not collapse prematurely because of the weight of its existing debt. See *In re Jartran, Inc.,* 732 F.2d 584, 586–88 (7th Cir.1984); *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir.1986). In economic terms, the prioritizing of postpetition debt enables the debtor (or trustee) to ignore sunk costs—treat bygones as bygones—and continue operating as long as the debtor's business is yielding a net economic benefit. The purpose is relevant to any borrowing, trade or otherwise, in which the debtor engages after entering bankruptcy.

*Id.* at 1127.

**81.** Real estate taxes, being in rem, are not entitled to administrative priority because, by definition, they are never the obligation of the

itself an "actual, necessary cost and expense of preserving the estate?" After all, the administrative borrowing in *Handy Andy's* hypothetical was justified only because the tax collector was threatening foreclosure of the estate's property.

And finally, the *Handy Andy* panel observed that any interpretation of Section 365(d)(3), other than its own, when considered in "real-world" situations, would lead to "silliness," [82] for "[t]he rule for which National [the landlord] contends would make the rights of creditors turn on the happenstance of the dating of tax bills and the strategic moves of landlords and tenants." Perhaps. But the Bankruptcy Code is replete with opportunities for debtors, creditors and other parties in interest to take advantage of such happenstance and, indeed, there are many instances where undeserved advantages and penalties are realized because of a case's peculiar timing even when no strategies are being employed.

However, this reality should not undermine what otherwise constitutes a sensible expression of the legislature's will. *Union Bank v. Wolas,* 502 U.S. 151, 158, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991) ("The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning.") (citation omitted). Put simply, Congress, in enacting the Bankruptcy Code, has adopted a theoretical construct that results in the estate immediately becoming the successor in interest to the debtor's leasehold interests and all of its attendant burdens and that construct leads to inescapable consequences, for better or for worse. Indeed, the adoption of strategies is inevitable given that the timing of the triggering petition can be manipulated. Therefore, this court is not satisfied that the "silliness" perceived in *Handy Andy* can be equated with the absurdity that the Supreme Court itself has required to warrant a court's departure from what otherwise is the plain meaning of Congress' enactment.

> It is well established that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."

*Lamie,* 540 U.S. at 534, 124 S.Ct. at 1030 (2004) (quoting from *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)).[83]

---

estate itself. Consequently, foreclosure of the attendant lien is the taxing authority's single weapon. But a landlord's claim for unpaid postpetition rents is against the estate itself and, as such, it remains fair to ask why the landlord should not be awarded priority treatment if the estate is raced with eviction and the hoped for administrative borrowing does not come through.

**82.** "When context is disregarded, silliness results." *Id.* at 1128.

**83.** Fifth Third also cites *Vause v. Capital Poly Bag, Inc. (In re Vause),* 886 F.2d 794 (6th Cir.1989) in connection with its argument that it be awarded a pro rata share of the personal property taxes as an administrative expense. Although not on point, it is none-

theless a Sixth Circuit decision that deserves some discussion.

The debtors in *Vause* were farmers who had leased acreage on terms that required them to pay an annual rent of $36,000 on December 1 of each year for the prior season's tillage. Debtors filed a Chapter 11 petition on November 27, 1985 and concurrently filed a motion to reject the lease. The lease was then rejected with the court's approval on January 14, 1986.

The dispute between the parties was over the amount of the landlord's prepetition claim under Section 502(b)(6), and specifically, whether a pro rata share of the $36,000 rent that was to be paid on December 1, 1985, which was four days after the petition date, could still be included as rent "due" within the meaning of Section 502(b)(6)(B). The

## CONCLUSION

For the reasons given, this court is not swayed by the authority that either the Committee or Fifth Third has accumulated to support their respective positions concerning the denial of administrative rent otherwise agreed upon or the allowance of personal property taxes not yet billed. Other courts' interpretations of the Bankruptcy Code should by all means be given consideration when due, for consensus pro-

motes the Code's uniform application. But the desire for consensus, as laudable as it may be, must give way to a judge's sworn duty—to enforce Congress' enactments as written. There is, of course, a conflict when this duty runs up against the corresponding obligation to follow a superior court's ruling. However, no such conflict exists when the only competing demand is whatever remains in the federal system of common law stare decisis. *In re Livingston*, 379 B.R. 711, 722–28 (Bankr. W.D.Mich.2007) (Hughes.J.).[84]

---

Sixth Circuit held that it could be included on the theory that "due" was sufficiently ambiguous to warrant that interpretation under the circumstances. *Id.* at 803.

Fifth Third cites *Vause* because it, like *Handy Andy,* provides for a proration similar to the one Fifth Third advocates in this instance. However, *Vause* is clearly distinguishable because it addresses only the issue of the landlord's prepetition claim and then only in the context of interpreting Section 502(b)(6).

It is, though, interesting to speculate whether the *Vause* panel would have arrived at the same result had the landlord, armed with the Sixth Circuit's subsequent decisions that the debtors' leasehold would have immediately become the estate's property, *In re Southern Air Transport, Inc.,* 511 F.3d 526 (6th Cir. 2007), and that the estate would have taken the leased property subject to the same restrictions as had existed prepetition, *In re Graham Square, Inc.,* 126 F.3d 823 (6th Cir. 1997), argued that it was the estate, not the debtor, that owed the $36,000 on December 1, 1985 and, as such, it should be paid in full as an administrative priority claim. This court suspects that the landlord would still not have prevailed given that the debtors had at least filed their motion to reject before the December 1st date and that the rent was payable in arrears. But what is clear is that a much different analysis would have been required than the one the *Vause* panel in fact used and it is this different analysis that is also required in the instant case.

**84.** Stare decisis finds its roots in medieval England. When the Plantagenets assumed the throne, the administration of justice within the realm was largely a function of each locale's customs. Henry II, though, encouraged the development of a "common" law by sending out judges from his own court to hear

disputes throughout the land. Each judge would then share what he had heard with his colleagues before rendering a written opinion. These opinions, over time, became the basis upon which subsequent cases were decided. If the facts in a particular case were the same as those in a previously published opinion, then the law applied in the prior case dictated the outcome in the immediate case as well. If, however, the new case presented a distinguishable situation, the judge would publish for future reference a new opinion that further refined the common law. And so, the doctrine of stare decisis became associated with English jurisprudence. Stare decisis literally means "to stand by things decided." The common law and other judicially created legal systems could not exist without it being an integral part of the system. Stare decisis is indeed the mortar that holds judge—made law together.

Colonial America continued the common law tradition and. with it, the doctrine of stare decisis. The American Revolution, though, overhauled the status quo. Popularly elected legislatures, both at the federal and stale levels, have replaced the judiciary as the primary source of American law. Consequently Judges today seldom make law; rather, they for the most part interpret and enforce statutes enacted by the legislatures. Indeed, the Supreme Court, in the venerable case of *Erie R. Co. v. Tompkins,* declared that "[t]here is no federal general common law," and that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." 304 U.S. 64, 78, 58 S.Ct. 817, 823, 82 L.Ed. 1188 (1938). In other words, the federal courts, unlike their medieval English counterparts, have no inherent authority to create law. Their responsibility is simply to

**762**

Put simply, the opinions of other courts are important when persuasive. However, they are not binding unless issued by a superior court. Therefore, they should not be followed, no matter how numerous they might be, if the plain meaning of the Bankruptcy Code, as logically applied, requires a different outcome.

Moreover, this court does not view the conclusions it has reached in this opinion as particularly calamitous, for it is fair to say that courts today routinely award in commercial settings the actual rent accrued as the appropriate administrative expense with the exception of the sixty-day gap that still remains for equipment leases. Unfortunately, what has happened is that these courts have based their reasoning on a misinterpretation of Section 365(d)(3) and (d)(5). Had they instead considered more carefully the theory and the history that underlies both the former Act's and the current Code's treatment of executory contracts and unexpired leases, this court believes that they would have arrived at the very same conclusions based

upon much sounder reasoning. But with that effort would have also come the realization that the same treatment—i.e., the award of actual rent as an administrative claim—is also required for the first sixty days of a commercial equipment lease and for that matter, for any other lease for which administrative rent is sought.[85]

Therefore, the court will proceed with the disposition of Fifth Third's administrative claim consistent with this opinion. Accordingly, a status conference will be scheduled at which time each party will be given the opportunity to identify what, if any, legal or factual issues remain that must still be decided before a final award can be made.

interpret what has been created elsewhere, whether at the federal or state level.

\* \* \*

Stare decisis, of course, still plays a role in American jurisprudence. The Supreme Court itself has stressed its continued importance....

\* \* \*

But the Supreme Court has made it equally clear that modern stare decisis is a judicial policy, not a law. *Payne v. Tennessee*, 501 U.S. 808, 828, 111 S.Ct. 2597, 2609–10, 115 L.Ed.2d 720 (1991), *Planned Parenthood of SE Pennsylvania v. Casey*, 505 U.S. 833, 854, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992), *Hohn v. U.S.*, 524 U.S. 236, 251–52, 118 S.Ct. 1969, 1977, 141 L.Ed.2d 242 (1998).
*Id.* at 722–24.

**85.** Nor should the Code's elimination of the *Copeland* fiction be viewed as all bad for the bankruptcy estate and its creditors. Granted, landlords and lessors are now in a more fa-

vorable position with respect to claims for administrative rent. However, purchasers of real estate and other unique property have been placed in a worse position. For example, property that the debtor had agreed to sell prepetition could not under the former Act become property of the estate unless the trustee was willing to sell to that particular buyer. However, that property would now be part of the estate immediately upon the commencement of the case as a consequence of *Copeland's* elimination. Consequently, the trustee is now in the position to not only reject the prepetition agreement to sell the property to that buyer but also to men sell that property to another person for a much larger price, leaving the original purchaser to only its prepetition damages as a consequence of that rejection. 11 U.S.C. § 502(g). But, *see also*, 11 U.S.C. § 365(i), which permits a non-debtor land contract vendee who is in possession to continue to demand performance from the estate under the land contract even though it would be subject to rejection.